Gorman, J.
 

 In this state the sole method of review from an order of the Public Utilities Commission is by an appeal to this court. New evidence is not adduced upon the appeal, but this court considers the law and facts upon the record made before the commission. Under such circumstances, it is essential that the Public Utilities Commission conduct a fair and open hearing with suitable opportunity being given through evidence and argument to challenge the result found by the commission.
 
 West Ohio Gas Co.
 
 v.
 
 Public Utilities Commission,
 
 294 U. S., 63, 79, 79 L. Ed., 761, 773, 55 S. Ct., 316, 324;
 
 Ohio Bell Telephone Co.
 
 v.
 
 Public Utilities Commission,
 
 301 U. S., 292, 301-306, 81 L. Ed., 1093.
 

 It is necessary for this court to review both the law applied and the evidence to ascertain whether the order was “unlawful or unreasonable.” Section 544, General Code;
 
 Lima Telephone & Telegraph Co.
 
 v.
 
 Public Utilities Commission,
 
 98 Ohio St., 110, 120 N. E., 330;
 
 Village of St. Clairsville
 
 v.
 
 Public Utilities Commission,
 
 102 Ohio St., 574, 132 N. E., 151;
 
 Cleveland Provision Co.
 
 v.
 
 Public Utilities Commission,
 
 104 Ohio St., 253, 135 N. E., 612, 23 A. L. R., 404;
 
 City of
 
 
 *218
 

 Cleveland
 
 v.
 
 Public Utilities Commission,
 
 127 Ohio St., 432, 189 N. E., 5.
 

 Generally, through a long line of decisions, it has been held that if the legal rule applied by the commission is erroneous or if the facts found are manifestly against the weight of the evidence, the order should be reversed.
 
 Settle
 
 v.
 
 Public Utilities Commission,
 
 94 Ohio St., 417, 419, 114 N. E., 1036;
 
 Points
 
 v.
 
 Public Utilities Commission,
 
 96 Ohio St., 560, 565, 118 N. E., 107, 109, 97 Ohio St., 191, 200, 119 N. E., 507, 510;
 
 A., C. & Y. Ry. Co.
 
 v.
 
 Public Utilities Commission,
 
 96 Ohio St., 359, 117 N. E., 314;
 
 Hardin-Wyandot Lighting Co.
 
 v.
 
 Public Utilities Commission,
 
 108 Ohio St., 207, 213, 214, 140 N. E., 779, 781;
 
 City of Findlay
 
 v.
 
 Public Utilities Commission,
 
 111 Ohio St., 817, 146 N. E., 316;
 
 Eager
 
 v.
 
 Public Utilities Commission,
 
 113 Ohio St., 604, 149 N. E., 865;
 
 Solt
 
 v.
 
 Public Utilities Commission,
 
 114 Ohio St., 283, 150 N. E., 28;
 
 Lykins
 
 v.
 
 Public Utilities Commission,
 
 115 Ohio St., 376, 154 N. E., 249;
 
 Gilbert
 
 v.
 
 Public Utilities Commission,
 
 131 Ohio St., 392, 396, 3 N. E. (2d), 46, 48. But in determining whether a rate is confiscatory it is necessary for the court to examine the evidence anew and exercise its independent judgment.
 
 Ohio Valley Water Co.
 
 v.
 
 Ben Avon,
 
 253 U. S., 287, 64 L. Ed., 908, 40 S. Ct., 527;
 
 Ohio Utilities Co.
 
 v.
 
 Public Utilities Commission,
 
 267 U. S., 359, 69 L. Ed., 656, 45 S. Ct., 259.
 

 Under the provisions of Section 499-9, General Code, in rate-making cases, in determining valuations the Public Utilities Commission of Ohio is directed to base such determination upon the reproduction cost new less depreciation. While under the provisions of Section 499-10, General Code, consideration may be given to outstanding bonds, original capital stock, moneys received from the issue of securities and receipts and expenditures, the Legislature has rather specifically set forth rules for valuations to be followed by both the commission and this court. Under the statutes in Ohio,
 
 *219
 
 relevant argument cannot be received that valuations should be based upon money prudently invested (see Brandies, J., in
 
 Missouri
 
 v.
 
 Southwestern Bell Telephone Co.,
 
 262 U. S., 276, 289, 67 L. Ed., 981, 985, 43 S. Ct., 544, 547) because the Legislature has adopted the principle of the rule set out in
 
 Smyth
 
 v.
 
 Ames,
 
 169 U. S., 466, 42 L. Ed., 819, 18 S. Ct., 418.
 

 The rate under the statute is to be determined by considering the cost of reproduction of the property at present value but, nevertheless, if it is contended that the result of such a method deprives the company of its property without due process of law contrary to the Fourteenth Amendment of the United States Constitution, the cost of construction and other evidence of the -history of the utility may be offered to determine whether the rate is confiscatory.
 
 Railroad Commission of California
 
 v.
 
 Pacific Gas & Electric Co.,
 
 — U. S., —, 82 L. Ed. Advanced Opinions, 327, decided January 3, 1938 (see U. S. Law Week, January 4, 1938, Index 464).
 

 While the standard fixed is the cost of reproduction less depreciation, nevertheless for rate-making purposes only that property which is “used and useful for the service and convenience of the public” may be considered. Section 614-46, General Code.
 

 In reviewing the orders in this case the court should decide whether the revenue raised by the rates gives a yield which is “something higher than the line of confiscation.”
 
 West Ohio Gas Co.
 
 v.
 
 Public Utilities Commission,
 
 294 U. S., 63, 70, 79 L. Ed., 761, 55 S. Ct., 316. This level must be attained by giving suitable opportunity to present evidence and argument.
 
 Southern Ry. Co.
 
 v.
 
 Virginia,
 
 290 U. S., 190, 78 L. Ed., 260, 54 5. Ct., 148.
 

 “Unjust and unreasonable rates and confiscatory rates are by no means synonymous. A rate which would not be confiscatory in character, by reason of the amount being somewhat above the point of confiscation,
 
 *220
 
 yet might not he a reasonable and just rate as between the public and the owner under all the circumstances of the case. ’ ’
 
 City of Portsmouth
 
 v.
 
 Public Utilities Commission,
 
 108 Ohio St., 272, 140 N. E., 604.
 

 It is our function to determine whether the finding as to a reasonable and just rate for the city of Akron by the commission was based upon the evidence and in accordance with the provisions of Sections 614-23 and 614-46, General Code, and other related statutes.
 

 The first error claimed by The East Ohio Gas Company relates to the cost of labor for the gas distribution and service mains. The company and the city in the hearing before the commission were able to agree upon the cost of materials for the mains, but not the cost of labor. After evidence was presented the commission made the following findings:
 

 “The items in Account 234 upon which there is no agreement are direct labor costs, top account costs, performance bond, and contractor’s fee. The company’s claim for these items is $2,160,909.00; the city’s $1,694,701.00, a difference of $466,208.00. The commission must determine whether or not the company’s claim is too high and if so how much and whether the city’s claim is too low and if so how much. In our adjustments we have given careful consideration to each item of labor cost and with the experience we have had in adjusting such matters heretofore, we believe that the total of estimates of these items of labor cost as claimed by the parties is incorrect. We, therefore, substitute our judgment as to a correct figure for these items in' the amount of $1,908,198.00, which, when added to the agreed to material and paving costs, makes a total reproduction cost new of $3,349,163.00 for Account 234.
 

 “In Account 235 the items upon which there is no agreement by the parties are direct labor costs, top account costs, performance bond and contractor’s fee.
 
 *221
 
 In this account, the company’s claim for these items is $543,568.00, the city’s $327,771.00, a difference of $215,797.00. We have adjusted these items as we did in Account 234 and find that our adjusted figure, $412,-548.00, is a proper allowance which, when added to the agreed to material and paving costs, makes a total reproduction cost new of $627,531.00.”
 

 Expert witnesses produced by both parties testified, and the commission in making the above finding set forth in detail costs for each single item in controversy. The company contended that the commission accepted a number of theories propounded by witnesses of the city which were impracticable.
 

 On the other hand, the claim is made by counsel for the city that the commission merely made a compromise by arbitrarily adopting a figure midway between that of the company and the city without any evidence to support the finding. Such a procedure, it is said, violates the rule set forth in the case of
 
 Ohio Bell Telephone Co.
 
 v.
 
 Public Utilities Commission,
 
 301 U. S., 292, 301, 81 L. Ed., 1093.
 

 If the commission had arbitrarily adopted a figure for costs approximately half way between the prices claimed by the two parties, the result would be open to question. The record shows this was not done. There were thirty separate items of labor which comprised the matters in dispute. In some instances the commission adopted the figures of the city while in others the valuation of the company was accepted. In many, the commission made its own finding.
 

 The commission, being a fact finding body, had in some respects the same function as a jury. It could accept any evidence it saw fit or could adopt a higher or lower figure where the record did not warrant the claim made. It could not, nor did it in this instance, take judicial notice of facts not in the record so that a review could not be had. But having evidence before
 
 *222
 
 it, it was justified in holding that the testimony of the experts was only partially true.
 
 Baltimore & Ohio Bd. Co. v. United States,
 
 298 U. S., 349, 359, 80 L. Ed., 1209, 56 S. Ct., 797. It was not limited in its decision to a narrow field to accept either the evidence of one side or the other.
 

 While some of the conclusions reached by the commission might not have been the findings of this court, we cannot say that they are either unreasonable or against the weight of the evidence. In no respect do they amount to a confiscation of property.
 

 The commission fixed December 31, 1932, as the date certain for the determination of the valuation under the provisions of Section 499-9, General Code. The ordinance was to be in effect from May 19, 1933, to May 19, 1937. The company maintains that after December 31, 1932, there was an upward trend in valuations- which was not considered by the commission.
 

 It will be conceded that the rates established must provide not only a reasonable rate of return at the time of investigation, but also for a reasonable time in the immediate future.
 
 McCardle
 
 v.
 
 Indianapolis Water Co.,
 
 272 U. S., 400, 408, 71 L. Ed., 316, 47 S. Ct., 144;
 
 Southwestern Bell Telephone Co.
 
 v.
 
 Public Service Commission,
 
 262 U. S., 276, 287, 67 L. Ed., 981,43 S. Ct., 544;
 
 Bluefield Water Works Co.
 
 v.
 
 Public Service Commission,
 
 262 U. S., 679, 692, 67 L. Ed., 1176, 43 S. Ct., 675.
 

 Courts will take judicial notice that there has been a depression, and that a decline in market values and cost of -labor accompanied it.
 
 Atchison, Topeka & Santa Fe Ry. Co.
 
 v.
 
 United States,
 
 284 U. S., 248, 76 L. Ed., 273, 52 S. Ct., 146;
 
 Dayton Power & Light Co.
 
 v.
 
 Public Utilities Commission,
 
 292 U. S., 290, 311, 78 L. Ed., 1267, 54 S. Ct., 647. “How great the decline has been for this industry or that, for one material or another, in this year or the next can be known only to
 
 *223
 
 experts, who may even differ among themselves.”
 
 Ohio Bell Telephone Co.
 
 v.
 
 Public Utilities Commission,
 
 301 U. S., 292, 301, 81 L. Ed., 1093.
 

 The commission in this case did actually fix valuations for the years 1933 and 1934, and found them to be somewhat less than that of December 31, 1932, mainly due to the deductions for accrued depreciation.
 

 The company claimed there was an increase from December 31, 1932, to December 31, 1934, of $713,429 in its valuation. ' In its computation it failed to consider all of the accrued depreciation. In fact, the only actual evidence offered to show an increase in valuation was a claim that labor and material costs in Akron in December, 1934, were ten per cent higher than on December 31,1932.
 

 This court will not take judicial notice of the fact that, because there was a ten per cent increase in the price of labor two years after the date of the investigation, such increase continued throughout the period of the ordinance. The testimony of the expert was not of such character that the commission could have made a rational finding in reference to valuations, but would have had to base a finding on pure conjecture.
 

 Therefore, upon the record and considering the return on the investment allowed from May 19, 1933, to the end of 1934, there was nothing in the finding of the commission that caused confiscation. Price trends, valuations, revenues and expenses subsequent to the date of the investigation up to December 31, 1934, were actually considered by the commission in arriving at its conclusions. -
 

 In this connection, since this proceeding is to be remanded, if upon rehearing a claim be made that because of alleged improved economic conditions subsequent to December 31, 1934, there has been a deprivation of property without due process, it seems proper to call the attention of the commission to the
 
 *224
 
 fact that such relevant evidence of actual operations must be received and the claim determined under the most recent ruling of the Supreme Court of the United States,
 
 McCart
 
 v.
 
 Indianapolis Water Co.,
 
 — U. S., —, 82 L. Ed. Advanced Opinion's, 315, decided J anuary 3, 1938. (See United States Law Week, January 4, 1938, Index 494, 495.)
 
 Indianapolis Water Co.
 
 v.
 
 McCart,
 
 89 F. (2d), 522, 525, 526. Under such circumstances, neither estimates nor prophecy need be considered, but only figures of actual experience;
 

 Claims are made on behalf of the city that the commission took an average of the expenses and revenues of the company during the years 1932, 1933 and 1934 and did not make a separate finding for each separate year. It is difficult to perceive how this was prejudicial to the city for in many instances it agreed to specific revenues and expenses determined under the method employed by the commission. There is nothing to show that the revenues and expenses obtained by this method were not fair and reasonable as an entirety, and if not, in specific instances, sufficient data was produced to review the findings in this court.
 

 The company asked that it be allowed an annual depreciation on its properties, exclusive of leaseholds and gas wells, of 2.65%, but the commission found a rate of 1.5% for such depreciation was sufficient. It is urged that the realized accrued depreciation as carried upon the books of the company showed a rate of 2.65% was necessary.
 

 Annual allowances of depreciation are made for the sole purpose of maintaining the property in a normal operating condition, and to equalize the costs of retirements and replacements from year to year.
 
 United Railways & Electric Co. of Baltimore
 
 v.
 
 West,
 
 280 U. S., 234, 253, 74 L. Ed., 390, 50 S. Ct., 123;
 
 Lindheimer
 
 v.
 
 Illinois Bell Telephone Co.,
 
 292 U. S., 151, 181, 78 L. Ed., 1182, 54 S. Ct., 658.
 

 
 *225
 
 An allowance for depreciation is to be made for the future as well as the past. While the history of the company’s depreciation is a factor, it is not the sole one. This court, where somewhat similar facts and circumstances were presented, upheld a ruling of the commission where annual depreciation was fixed at 1.4%. There is nothing in the record in this case to cause this court to hold that the commission’s finding on this subject was' either manifestly against the weight of the evidence or produced a confiscatory result.
 
 West Ohio Gas Co.
 
 v.
 
 Public Utilities Commission,
 
 128 Ohio St., 301, 196 N. E., 105, 294 U. S., 63, 79 L. Ed., 761, 55 S. Ct., 316.
 

 The company claims it was entitled to some allowance for going concern valué. One witness testified in reference to the extensive business established, and the municipalities and consumers served by the company. He did not reach any specific conclusion as to the value in dollars of the worth of the going concern. It is submitted by the company that upon his testimony at least ten per cent of the total valuation should have been allowed.
 

 Whether going concern value should be considered depends upon the financial history of the company.
 
 City of Houston
 
 v.
 
 Southwestern Bell Telephone Co.,
 
 259 U. S., 318, 66 L. Ed., 961, 42 8. Ct., 486. However, when substantial allowances for organization, interest, emergency and other general expenses during construction are madé, a specific allowance for going concern is not necessary.
 
 Hardin-Wyandot Lighting Co.
 
 v.
 
 Public Utilities Commission,
 
 118 Ohio St., 592, 162 N. E., 262.
 

 The evidence presented by the expert was not of such a character as to furnish the commission with an adequate basis for fixing such a valuation. It was founded almost entirely upon remote assumptions and speculations without proof of any intrinsic worth not included in other property valued. The claim was
 
 *226
 
 therefore properly denied.
 
 St. Joseph Stock Yards Co.
 
 v.
 
 United States,
 
 298 U. S., 38, 80 L. Ed., 1033, 56 S. Ct., 720. _
 

 _ The court feels that the company has just complaint against the method used to determine amounts to be expended for both the federal income tax and state excise tax. An allowance for the payment of federal income taxes must be made in rate cases.
 
 Galveston Electric Co.
 
 v.
 
 City of Galveston,
 
 258 U. S., 388, 66 L. Ed., 678, 42 S. Ct., 351;
 
 Georgia Ry. & Power Co.
 
 v.
 
 Bd. Commission of Georgia,
 
 262 U. S., 625, 633, 67 L. Ed., 1144, 43 S. Ct., 680.
 

 The city contended that only the actual amount of taxes to be paid during the years 1932, 1933 and 1934 as carried on the books of the company should be considered. Adopting this theory, the commission made an allowance of 3.4% per annum for federal income taxes.
 

 The company contends that during the ordinance period the actual rate would have been 14.2% of the revenues. Whether this be true, we are unable to ascertain from the record. It can be said, however, that the rate of taxation in the years after 1935 was greater than in previous years. The commission knew this fact at the time of its order, and to base its allowance for taxes upon a rate in past years which was lower than that which they knew would be assessed was arbitrary and unreasonable.
 

 Then, again, at the time of the hearing the taxes of the company were in dispute. In 1934, it was claimed that due to a refund to consumers in Cleveland, no taxes were assessable. This precise situation probably would not occur in future years. It was the duty of the commission to consider not only the taxes actually assessed during the test period, but to compute what they would be after the test period in view of the change in laws in the years. This the commission failed to do. The finding is therefore reversed and
 
 *227
 
 remanded -with instructions to determine the amount of taxes actually paid or which will he paid during the ordinance period and charged against The East Ohio Gas Company.
 

 To ascertain the error in reference to the state excise tax allowance, it is hardly necessary to more than quote from the commission’s findings:
 

 “The parties are in agreement as to the average excise tax rate for the years 1932,1933 and 1934. East Ohio contends that although the average excise tax rate for these years was 2.26% and since the ordinance period is from May 19,1933, to May 19,1937, the average rate for this period, 2.96%, should be applied to revenues considered. The city contends that actual excise taxes assignable to the respective years should be used. Economic conditions have shown improvement since December 31, 1934, and it may be assumed, therefore, that wages and other costs of operations will probably be higher for that portion of the ordinance period not considered here. For example, the Social Security Act, a new federal law, will impose, we know, additional expense during 1936 and 1937.
 

 “On the other hand, this improvement in economic conditions may also result in increased sales for the company with resulting gains that more than offset the increased expenses of operation.
 

 “The commission, having considered this matter fully, is of the opinion that a proper allowance for excise taxes is an amount computed at the respective average excise tax rates for the years considered which we find to be 2.26%.” (Italics ours.)
 

 Such a ruling is predicated upon a speculative assumption that neither court nor commission can make. To withhold a complete allowance for taxes because business may improve is mere guess work. “To prefer forecast to experience in such cases is arbitrary.” (Syllabus)
 
 West Ohio Gas Co.
 
 v.
 
 Public Utilities Commission,
 
 294 U. S., 79, 79 L. Ed., 773, 55 S. Ct., 324.
 

 
 *228
 
 It being conceded that during the ordinance period the company would be called upon to pay 2.96% for excise taxes, such an amount should be allowed. The finding of the commission that only 2.26% be allowed is hereby reversed, and the commission is instructed to allow the percentage of 2.96% as that actually paid. To do otherwise' would be to permit admitted confiscation.
 

 The company offered evidence that it had a plan whereby it made certain expenditures to permit its employees to acquire stock of the parent company, The Standard Oil Company of New Jersey. As allocated to Akron, there was’ an annual charge for this claimed by the company of $5800.
 

 The commission, in passing upon this claim, treated it too lightly. In its findings we note:
 

 “The commission in the
 
 East Ohio-Cleveicmd case
 
 rejected the item of expense ‘Stock Plan Deposits.’ While we feel there is much merit to the plan, nevertheless upon consideration of the facts in this case, which are not unlike the facts in the
 
 East Ohio-Cleve-Icmd case,
 
 we do not approve its allowance.”
 

 The plan enables employees to acquire stock in the parent company, The Standard Oil Company of New Jersey. Yet it is said that no matter how laudable the plan is the consumers of Akron should not have to bear such an expense.
 

 Certainly, today, there is a general widespread feeling that industry owes to its employees not only the negative duty of refraining from overworking or injuring them, but likewise the affirmative duty of providing them so far as possible with economic security. Expression of such views has found legislative sanction in the adoption of social security laws.
 

 It is a much disputed question in ordinary industry whether corporate managers are trustees solely for the stockholders! or whether s'ociety in general has some rights in the management. 44 Harvard Law
 
 *229
 
 Rev., 1049; 45 Harvard Law Rev., 1145, 1365. But so far as public utilities are concerned, their property is only strictly private in a qualified sense.
 

 It would seem that' if the plan adopted is a fair one which promotes economic security for the employee and thereby increases his mental and moral efficiency as a worker, such payments made for his benefit should be considered as compensation just the same as his weekly or monthly salary. For this reason, the ruling of the commission should be reversed, and the commission is ordered to make an allowance for the sums actually expended by the company in assisting its employees to purchase stock.
 

 A return of 6%% on the valuation was allowed by the commission, which is similar to that allowed in other cases before this court for approximately the same period. A rate of return may vary as1 to times depending on business conditions, but it must be one that shall be reasonably sufficient to assure confidence in the 'financial soundness of the utility.
 
 Bluefield Water Works
 
 v.
 
 Public Service Commission,
 
 262 U. S., 679, 692, 693, 67 L. Ed., 1176, 43 S. Ct., 675.
 

 The company claimed that it was entitled to a return of 7%% to 8% while the city, following the dissent of Commissioner Schaber, felt a rate of 6% was adequate.
 

 The testimony of the company was predicated upon a supposition that the cost to the company of the preferred stock should be 7.04% annually and of the common stock 8.89% annually. While this court cannot take judicial notice of facts not in the record, it can take notice of the fact that there was a severe depression during the years 1931, 1932 and 1933 which affected the earnings and yield of all companies.
 

 The tables and evidence introduced show that a rate of return of 6%;% during the early years of the ordinance would be high, but that during the latter years
 
 *230
 
 was fair and reasonable. It is not a rate that could be said to be confiscatory.
 

 On tbe other band, in reviewing rates allowed to wasting asset corporations during normal times, many are in excess of tbe one found by tbe commission. Considered from that standpoint, the city’s contention that tbe rate was excessive must be rejected in view of tbe fact that similar rates for similar periods have been approved by tbe courts.
 
 Dayton Power & Light Co.
 
 v.
 
 Public Utilities Commission,
 
 292 U. S., 290, 78 L. Ed., 1267, 54 S. Ct., 647;
 
 Columbus Gas & Fuel Co.
 
 v.
 
 Public Utilities Commission,
 
 292 U. S., 398, 78 L. Ed., 1327, 54 S. Ct., 763.
 

 We have reviewed herein s'ome of tbe assignments of errors claimed by tbe city of Akron, but there are, however, several important items yet to be considered. While tbe court has disposed of tbe claim that tbe cost of labor found for the laying of tbe distribution and service line equipment was high, it is contended that tbe formula employed for tbe ascertainment of tbe depreciation of field and transmission lines was improper. (Accounts 213, 214 and 226.)
 

 Tbe company suggested that tests should be made in an 18-inch section of tbe ten deepest pits to determine tbe depreciation of tbe pipe. Tbe city suggested taking tbe deepest pit in an 18-ineh section of exposed pipe or tbe probable deepest pit in a 20-foot joint of pipe. It was contended that a full joint of pipe rather than an 18-inch section.should be used as a test since it was necessary to dis'cover where tbe pipe was the weakest or thinnest.
 

 The commission, following past practices, adopted the formula presented by tbe company. According to tbe great weight of tbe evidence, tbe tests used by tbe commission disclosed an average condition of tbe pipe, and accordingly this court finds tbe test used was a fair one.
 

 One of tbe principal objections made by tbe city is
 
 *231
 
 to the allowance for replenishing wasting assets. The commission made a finding that “the amount of $304,-000 annually for the purpose of ‘expenditures necessarily incurred in developing operated leaseholds’ is proper and reasonable and is' accordingly allowed which, after allocation to Akron, amounts to an average of $26,590.00 for each of the years 1932, 1933 and 1934 on a gas sales basis.”
 

 The commission, in making this finding, stated that the method used was “a departure from what has been done before by this commission,” but that it was reasonable and based on the facts in the record. To this ruling, Commissioner Schaber filed the following dissent:
 

 “The majority commissioners have included in the expenses of the company an allowance for so-called expenditures incurred in developing leaseholds. This they designate ‘cost incurred in past’ and fix the amount at $304,000 per annum, allocating this additional expense to Akron for the year 1932 — $28,090; for 1933 — $25,992, and for 1934 — $25,688. This item is based on the amount of delay rentals paid in the past on unoperated acres and on investments in unoperated acres cancelled, and is clearly an allowance for payments for delay rentals upon leases in reserve (leases' not presently used or useful) many of which have been cancelled, under a new name. These allowances include not only the cost of carrying presently unoperated acreage, but the cost of acquiring and carrying unoperated acres not even now owned by the company —they include costs for acreage which will never be used and useful in the service of gas consumers. It is nothing more than ‘old man delay rentals’ on unoperated leases' disguised in a new fantastic garb. Items of this character have been repeatedly rejected by this commission in the past and such disallowances approved by the Supreme Court of this state as well as by the Supreme Court of the United States.
 
 Logan
 
 
 *232
 

 Gas Co.
 
 v.
 
 Public Utilities Commission,
 
 121 Ohio St., 507, 169 N. E., 575;
 
 Columbus Gas & Fuel Co.
 
 v.
 
 Public Utilities Commission,
 
 127 Ohio St., 109, 187 N. E., 7;
 
 Columbus Gas & Fuel Co.
 
 v.
 
 Ohio Public Utilities Commission,
 
 292 U. S., 398. Such was also our holding in the
 
 Cleveland rate case
 
 decided in July, 1934.
 

 “It should be noted that this expense item is in addition to the allowance, out of current earnings, for depletion of the wasting assets of the company such as operated leaseholds, gas well construction and gas well equipment, providing for a fund whereby new leases can be acquired. Applying the method used in the
 
 Cleveland rate case
 
 in finding the adjusted hook cost or value of operated leaseholds and natural gas rights, which costs are to he returned to the company by annual allowances' as part of operating expenses, the adjusted hook cost of such leases and rights at December 31, 1932, should he $2,734,541; the depreciated value thereof as of that date should be $2,077,547. These sums allocated to Akron should he $252,672 and $191,-965 respectively.
 

 “The action of the majority commissioners in allowing such an item of expense is' a marked departure from what was done by the commission in the
 
 Cleveland rate case
 
 as well as placing an additional cost upon the rate payer not heretofore sanctioned by commission or court. Instead of having consistency in utility regulation it tends to uncertainty as well as to discrimination between the company’s' own customers.
 

 “What is said here will apply equally to a like allowance in the case of The Hope Natural Gras Company.”
 

 It is well settled that delay rentals paid by a producing gas company to keep alive leases of gas land in reserve should not he charged to operating expenses when an annual amortization allowance makes provision whereby new leases' can he acquired and paid for out of current earnings.
 
 Dayton Power & Light Co.
 
 v.
 
 Public Utilities Commission,
 
 292 U. S., 290, 306,
 
 *233
 
 78 L. Ed., 1267, 54 S. Ct., 647. The sole question is whether sufficient depreciation allowance was made for replacement of operated wells when exhausted.
 
 Columbus Gas & Fuel Co.
 
 v.
 
 Public Utilities Commission,
 
 292 U. S., 398, 406, 78 L. Ed., 1327, 54 S. Ct., 763.
 

 It is conceded that, in addition to this allowance designated as “expenditure necessarily incurred in developing operating leaseholds,” other allowances were made for the depletion of wells on operated leases, for the book cost of operated leaseholds, and for drilling dry holes. These allowances would restore the nominal book cost by the time the gas was exhausted.
 

 It is said, however, that such allowances do not restore any part of the sums spent in other activities for carrying, cancelling and shifting leases to find gas-bearing acres now used in service.
 

 These allowances, together with one arising under the formula adopted by Commissioner Schaber, would provide funds for the depletion of wells. To make an allowance for such activities as an operating expense would be to base a rate on property which was not used and useful in serving the public. Despite the fact that by the method used by the commission only part of the amounts formerly considered delay rentals by courts were allowed, even such an allowance cannot be sanctioned.
 

 Operating expenses are to be based upon the management of property which is used and useful. When the'non-productive acreage is used for purposes of production, the costs incurred in carrying it during its non-productive period may then be capitalized. It is improper to consider such expenditures, which later are to be considered capital expenditures, as current operating expenses at this time.
 

 The commission, therefore, should have allowed only $15,068 in 1932, $14,013 in 1933 and $15,945 in 1934 for
 
 *234
 
 the depletion of wasting assets instead of the average sum of $42,093 for these years.
 

 About half of the gas used in the city of Akron was purchased by The East Ohio Gas Company from its affiliate, The Hope Natural Gas Company, at a contract price of 38% cents per M.c.f. at the river. The commission found that this rate was fully sustained by the evidence.
 

 It is' claimed that in a recent Cleveland rate case, the commission found that a fair price for gas purchased by The East Ohio Gas Company from The Hope Company should not exceed 37.1 cents per M.c.f. during a period from June 1, 1931, to June 1, 1936.
 

 It is argued that the contract price should not be any higher in this case. This court cannot take judicial notice of the holding of the commission in another controversy. Likewise, there is just as much ground to suppose that the commission erred against the company in the Cleveland case as there is to suppose it erred against the city of Akron in this case. For these two reasons, consideration of the Cleveland case cannot be any authority in this appeal, but the court must be guided solely by the evidence now. before it.
 

 It is true that evidence of the rate in the Cleveland case was introduced, and while it should be considered in the determination of the rate in this case, it. might be pointed out that the rate period in the Cleveland case was for different years than in the case now'before the court. If the rate fixed by the commission in the Cleveland case had been 45 cents per M.c.f. at the river, the city of Akron would not be prevented from asserting such a finding was not fair and reasonable. Under such circumstances certainly no one would contend that the river rate in the Cleveland case should be conclusive any more than that the river rate established by other gas companies furnishing gas to other municipalities would be so considered. It, therefore, is a single item of evidence which should be considered
 
 *235
 
 together with other relevant items submitted by the parties.
 

 The city of Akron was not bound by the price for which The East Ohio Gas Company purchased a supply from The Hope Natural Gas Company, an affiliated gas producing company, but had the right to inquire into the reasonableness of the contract price.
 
 Dayton Light & Power Co.
 
 v.
 
 Public Utilities Commission,
 
 292 U. S., 290, 295, 78 L. Ed., 1267, 54 S. Ct., 647.
 

 The test to be applied is whether the price was higher than that which would fairly be paid by a buyer unrelated to the seller and dealing at arm’s length.
 
 Dayton Light & Power Co.
 
 v.
 
 Public Utilities Commission, supra,
 
 p. 308;
 
 Western Distributing Co.
 
 v.
 
 Public Service Commission of Kansas,
 
 285 U. S., 119, 76 L. Ed., 655, 52 S. Ct., 283.
 

 The record in this case discloses that The Hope Natural Gas Company of West Virginia in 1933 produced 4,875,364 M. c. f. and sold 37,080,135 M. c. f. In 1934 it produced 5,953,904 M. c. f. and sold 43,534,630 M.c.f. It held approximately 325,000 acres which were operated fields and over half a million acres of unoperated ones.
 

 From this we can deduce that much of the acreage owned by The Hope Company was held in reserve. In fact, it only produced about 12% of the gas which it sold while the remainder was purchased from independent producers for approximately twenty cents' per M. e. f. at the well mouth.
 

 It is contended that the company should in some way be'penalized for this method of operation. If the fields were operated to capacity every day, the length of the life of the company as a producer might be shortened, the fields depleted and exhausted and the consumers might have to look to new sources for a supply of gas. For that reason this' court cannot condemn such a
 
 *236
 
 policy at this time unless it would result in an exorbitant charge being made for gas.
 

 In determining whether the contract price of 38.50 cents per M. c. f., existing between The Hope Natural Gas Company and The East Ohio Gas Company, was fair and reasonable, the commission did not take all the facts into consideration. It valued the property of The Hope Natural Gas Company and determined its revenues1 and expenses the same as it did the property of The East Ohio Gas Company, and apparently made its findings upon an assumption that The Hope Company produced all of the gas sold to The East Ohio Gas Company. To test the contract price by such a method was to substitute a fiction for realities.
 

 Inquiry, of course, may and ought to be made of the valuation, revenue and expenses of an affiliated seller.
 
 Columbus Gas & Fuel Co.
 
 v.
 
 Public Utilities Commission,
 
 292 U. S., 398, 400, 414, 78 L. Ed., 1327, 54 S. Ct., 763;
 
 Western Distributing Co.
 
 v.
 
 Public Service Commission of Kansas,
 
 285 U. S., 119, 76 L. Ed., 655, 52 S. Ct., 283, 58 F. (2d), 241;
 
 Smith
 
 v.
 
 Illinois Bell Telephone Co.,
 
 282 U. S., 133, 152, 153, 125 L. Ed., 255, 51 S. Ct., 65;
 
 United Fuel Gas Co.
 
 v.
 
 Railroad Commission of Kentucky,
 
 278 U. S., 300, 73 L. Ed., 390, 49 S. Ct., 150. But that is not the only method of determining whether the price paid by one producing gas company to an affiliate is a fair one.
 

 Some years ago this court held that under the provisions of Section 614-23, General Code, affiliated buyers must be served at reasonable rates, and that principle was approved by the Supreme Court of the United States.
 
 Ohio Mining Co.
 
 v.
 
 Public Utilities Commission,
 
 106 Ohio St., 138, 142, 143, 140 N. E., 143;
 
 Columbus Gas & Fuel Co.
 
 v.
 
 Public Utilities Commission, supra,
 
 414.
 

 When the commission attempted to determine a fair cost of the gas at the Ohio river solely by the reproduc
 
 *237
 
 tion method, it ascertained it would he 42.82 cents per M. c. f. Furthermore, the commission found that inasmuch as the contract price was only 38.50 cents per M. c. f., that was fair even though when a computation was made the evidence showed that The Hope Company would only receive a 3.72% return at that price.
 

 It should he obvious that The Hope Company would not agree to such a low return and the commission should have been able to determine from such a test that the method employed was not a fair one upon which to base its findings.
 
 Dayton Light & Power Co.
 
 v.
 
 Public Utilities Commission,
 
 292 U. S., 290, 311, 312, 78 L. Ed., 1267, 54 S. Ct., 647. Whether this computation was erroneous because delay rentals were improperly considered or because the fields were held in reserve, we cannot say from the record.
 

 A true method of testing the fair price of gas would be to determine what the average price of the 12% of gas produced by The Hope Company cost, and what the average price of the 88% of'the gas purchased from independent producers cost. To those costs should be added the fair and reasonable amounts necessary to transport the gas, either produced or purchased, to the river. After that determination, by considering the proportionate quantities sold, a fair price at the Ohio river would thereby be obtained.
 

 It was conceded that The Hope Company paid on an average approximately twenty cents per M.c.f. at the well mouth to independent producers'. At the suggestion of the representatives of the city of Akron, the commission tested the rate by substituting that figure for the one based on the cost of production of the gas produced by The Hope Company. When that substitution was made, it was found that the price at the river would be 38.11 cents.
 

 This substitute method was upon the assumption that all the gas was purchased and none produced by
 
 *238
 
 The Hope Company. However, inasmuch as it was conceded that the price for gas at the well mouth was twenty cents per M. c. f. and all other figures used were based on the evidence, our examination shows that 38.11 cents per M.c.f. would be a fair price for the 88% of the gas purchased by The East Ohio Gas Company from The Hope Company.
 

 In reference to the other 12%, the commission should recompute the cost of the price of the gas produced by The Hope Company by eliminating delay rentals, but following the rules in regard to taxes and stock plan deposits set forth herein. In this recomputation, however, if the cost is excessive it cannot be allowed. To find otherwise, the commission would be sanctioning a price which would be more than fair and reasonable, and one which would not be comparable to that which an unrelated buyer would pay to an unrelated seller dealing at arm’s length.
 

 That portion of the order dealing with the price of gas to be paid to The Hope Company at the Ohio river is reversed and remanded with instructions to recompute a fair cost of the gas produced and sold by The Hope Company to The East Ohio Gas Company.
 

 There is a claim made that, since the city of Akron is situated in the immediate vicinity of a large field, its geographical advantage should be reflected in the gas furnished to its inhabitants. This claim seems somewhat inconsistent with the admission that a large portion of the gas consumed comes from the West Virginia fields and is sold by The Hope Natural Gas Company. Consideration, of course, should be given, in determining the price, to the fact that it costs less to transport gas produced near Akron than it does to carry it from far distant fields. The evidence shows that the gas produced in the Akron district is piped into a system forming a unit which furnishes gas to many municipalities. The Akron consumer has no
 
 *239
 
 right to insist that he shall be supplied only with gas from Ohio fields. If Cleveland took the same position the field might be exhausted, and only the smaller communities would pay the price of West Virginia gas. The city did not offer sufficient evidence to be given an allowance on the theory presented.
 

 The commission allowed the company to include its entire rate-case expense of $119,344 as a proper deduction, amortized over a four-year period. While the commission found the ordinance rate was unreasonable, it is claimed, nevertheless, that the commission found the company should reduce its rates and make certain refunds to consumers. For this reason, it is said that only a portion of the rate-case expense should be allowed.
 

 It was necessary for the company to seek a review before the commission unless it desired to abide by the ordinance rate which the commission thereafter found was unlawful and unreasonable. To show that the rate was confiscatory, evidence of valuation and operating expense had to be presented. This was a single hearing, and such evidence was used also to determine the rate. It would be impossible to ascertain if there was any evidence which w’as exclusively relevant in the ordinance case that was not likewise relevant to a proper rate determination. The effect of the hearing and evidence was so broad that it was relevant to both issues. It would, therefore, be impossible to prorate such expense, and this court sees no reason for so doing. The entire rate-case expense was properly allowed. See
 
 Monroe Gaslight & Fuel Co.
 
 v.
 
 Michigan Public Utilities Commission,
 
 11 F. (2d), 319, 325;
 
 Mobile Gas Co.
 
 v.
 
 Patterson,
 
 293 F., 208 (modified on other grounds in 271 U. S., 131, 70 L. Ed., 870, 46 S. Ct., 445).
 

 Other minor errors are alleged, but none of them would have any substantial bearing upon the reason
 
 *240
 
 ableness of tbe rates, and this court finds no other errors than those pointed out herein.
 

 Summarizing the conclusions’ reached, the court finds that the Public Utilities- Commission committed error in its computation of the federal income and state excise tax allowances', and in its failure to give any allowance for the company’s payments on the plan whereby employees could purchase stock. The commission likewise made an improper allowance for so-called expenditures incurred in developing operating leaseholds, and used an improper method in testing whether the contract price for sales of gas by The Hope Natural Gas Company to The East Ohio Gas Company was a fair one. Except in these respects, the court finds no error, and the separate findings, other than those mentioned, should be affirmed.
 

 From the record presented this court cannot in all instances make specific findings of fact to correct those improperly made by the commission. That is the function of the commission.
 

 Because of the errors set forth, the order of the commission was unreasonable and unlawful. The order is therefore reversed and remanded to the Public Utilities Commission with instructions to correct the improper findings' in accordance with the ruling of the court.
 

 Order reversed and remcmded.
 

 Weygandt, C. J., Matthias, Day, Zimmerman and Williams, JJ., concur.