Lamneck, J.
Section 544, General Code (Section 4903.13, Revised Code), provides that “a final order made by the commission shall be reversed, vacated or modified by the Supreme Court on appeal, if upon consideration of the record such court is of the opinion that such order was unlawful or unreasonable.”
*399 This section has been construed as limiting the power of the court on review to a determination of whether the final order of the commission is supported by substantial evidence and is in accordance with the standards established by law.
In the case of City of Marietta v. Public Utilities Commission, 148 Ohio St., 173, 74 N. E. (2d), 74, the fourth paragraph of the syllabus reads as follows :
“A court will not substitute its judgment as to the value of public utility property or as to the cost of production and distribution of public utility service for the finding of the commission on these matters and will not reverse the order of the commission thereon unless there is a clear showing that it has abused its discretion or has omitted to give just consideration to some element in the determination of the rate-base structure or the rate of return which makes its finding unlawful or unreasonable.”
The appellants’ main contentions are that the commission erroneously allowed the inclusion of certain items in the company’s recurring expenses as a basis for needed revenue, some of which items they contend are not properly includable and some of which they contend, if includable, are nonrecurring expenses and, therefore, are includable only when properly amortized over a period of years, and that certain other items were erroneously included in the rate-base structure.
First, the appellants contend that the commission wrongfully allowed as a recurring annual legitimate expense an item of $647,026 for federal excess profits taxes.
Basically, a regulated public utility should not be. entitled to earn profits that are excessive.
However, Sections 499-9 and 614-23, General Code (Sections 4909.05 and 4909.15, Revised Code), provide that, in fixing the valuation of a public utility’s property used and useful for the service and convenience of *400 the public, the commission shall base its value on the cost of reproduction new as of a date certain minus depreciation, and that a utility is entitled to a fair and reasonable return on such valuation. It is conceivable that circumstances might exist where, in fixing rates which will produce a fair and reasonable return on such a valuation, revenues would be produced that would enable the utility to earn large profits based on the par value of its capital stock.
In City of Cincinnati v. Public Utilities Commission, 153 Ohio St., 56, 90 N. E. (2d), 681, this court held that “excess profits taxes paid by a utility to the federal government may be considered by the commission as an operating expense of the utility, particularly where no objection is registered thereto at the hearings before the commission.”
In the instant case; however, strong objections were registered by the appellants, in the hearings before the commission, to the inclusion of any allowance of an item for excess profits taxes as a recurring expense of the company.
On July 1, 1952, which is the day certain in these cases, the company’s earnings, under the rates then in effect, did not require it to pay federal excess profits taxes. The federal excess-profits-tax statute was automatically scheduled to expire by its terms on June 30, 1953, and, after a limited extension, it did actually expire on December 31,1953. It was only through the increase in rates, allowed by the commission, that the company was required to pay any excess profits taxes and then only for a short period. This clearly was not a recurring expense to be included in the expenses of the company for rate-making purposes. It is the universal rule that nonrecurring expenses must be disallowed in their entirety or amortized over a reasonable period. See Hardin-Wyandot Lighting Co. v. *401 Public Utilities Commission, 108 Ohio St., 207, 215, 140 N. E., 779.
In East Ohio Gas Co. v. Public Utilities Commission, 133 Ohio St., 212, 226, 12 N. E. (2d), 765, it is stated that “it was the duty of the commission to consider not only the taxes actually assessed during the test period, but to compute what they would be after the test period in view of the change in laws.”
Since the company was not required to pay federal excess profits taxes under its rates in effect on the day certain, July 1, 1952, was only required to pay excess profits taxes in the total sum of $378,431, by the increase in rates authorized by the commission on May 28,1953, and is not required to pay any such taxes after December 31, 1953, it was unlawful and unreasonable for the commission to include as a recurring annual expense an item of $647,026 for excess profits taxes.
The company has had a pension plan for its employees since 1913. Its present annual current payment into this fund amounts' to approximately a half million dollars. It is admitted that this annual payment is a proper charge to be included in operating-expenses for rate-making purposes.
From 1913 until 1927, such pensions were handled on a pay-as-you-go basis. In 1927, a change was adopted to permit advance collections for pension payments on an actuarial basis. However the rates adopted at that time did not provide sufficient money for the payment of all pensions that might accrue, since many of the employees had accumulated service prior to the establishment of the pension fund. Beginning in 1941, the company made annual “freezing payments” of amounts equivalent to the interest on the unfunded actuarial reserve in order to arrest its growth. Beginning in 1945, the company began amortizing the ‘ ‘unfunded actuarial reserve” deficiency to extend over *402 a ten-year period. The 1952 “freezing payment” amounted to $15,493 and the 1953 payment amounted to $11,531.74. The annual amortization payment amounted to $241,647 for the year 1952, and a similar amount was payable in 1953. The “unfunded actuarial reserve” deficiency will be completely amortized by the payment of $104,336 due in 1954. The Ohio intrastate portion which the commission allowed as a recurring annual expense was $241,647.
The appellants in the proceedings before the commission contended that the annual payments to freeze the unfunded reserve and to establish a funded “actuarial reserve” for the pension fund are not proper or legal charges to be included in current operating expenses of the company. They contended also that if they are legal and proper charges to operating expenses, they are not recurring expense items since the unfunded reserve would become fully amortized by the payment of $104,336 in 1954. They contended that, at best, such expenses are nonrecurring, requiring amortization over a five-year period. The commission disregarded these contentions of the appellants and allowed the “freezing payments” and the full amount of $241,647 annually as recurring expenses. We agree with the contention of the appellants that the inclusion of $241,647 as an annual recurring expense for payment to a funded “actuarial reserve” is not a proper charge to be included as annual recurring operating expenses of the company for rate-making purposes, where the “unfunded actuarial reserve” will be fully amortized by the payment of $104,336 in 1954. It is the opinion of this court that the annual current payments into the pension fund are properly includable as recurring expenses but that the “freezing” and amortization payments made to the unfunded actuarial reserve pension fund should be excluded or amortized over a reasonable period.
*403 The appellants also contend that the rate-base structure should be reduced by the amount of certain accruals, on the theory that they represent funds furnished by the customers that have either been invested in the company’s plant or are used as working capital. The accruals, which the appellants contend should be deducted from the rate-base structure, include those which are applicable to the company’s intrastate business and which are accrued for the payment of operating expenses and are of some permanency.
Pour accrued accounts, classed as deductible by appellants, with the average monthly balances for 1952, are as follows:
1. No. 160 Customers’ deposits $ 63,320.00
2. No. 164 Advance billing and
payments 551,039.00
3,987,878.00 3. No. 166 Taxes accrued
4. No. 167.03 Bents accrued 280.00
The company does not dispute that the accruals shown by these accounts, with the exception of account No. 164, advance billing and payments, were invested in plant or used as working capital on July 1, 1952, and that it started such a policy in 1948. It claims, however, that in fact it does not obtain any money from the advance billing and payments account. The record shows that customer billing remaining unpaid as of June 30,1952, amounted to $2,628,149, which was more than $1,500,000 greater than the amount of advanced billings and payments of $1,-102,078 on the same date. The commission found that the company had not obtained money from the advance billing and payments account, which it has invested in plant or used as operating capital. We do not disagree with that finding.
Account number 160, customers’ deposits, is fairly uniform and constant throughout the year and represents sums of money deposited with the company by *404 its customers either to secure payment of their bills or as advanced payments on installation charges.
Account number 167.03, rents accrued, represents rents charged to monthly expenses, which are actually paid at a future date.
Account number 166, taxes accrued, represents accruals for taxes for federal, state and local purposes. Such taxes are collected from customers in monthly installments in advance and disbursed at considerably later dates. Tax accruals, which are constant and available with reasonable certainty in the foreseeable future to the company for investment in plant or working capital, as of July 1,1952, approximated $3,500,000 per year.
The commission made no deduction for accruals in fixing the rate-base structure for the company.
In Pittsburgh v. Public Utility Commission, 370 Pa., 305, 88 A. (2d), 59, the Supreme Court of Pennsylvania held that it was reversible error for the commission in computing a rate base to “ignore the availability for cash working capital purposes of the amount collected and allocated for income tax purposes.” In that case, on page 315, the following comment appears:
“In the instant case in determining the need for cash working capital the commission adopted testimony of a 24-day lag in the receipt of payments for services rendered but in arriving at its conclusion completely ignored undisputed competent evidence coming from the same source that either reduced or eliminated the need. This was not an exercise of judgment by the commission but an arbitrary and unreasonable finding. ’ ’
In Citizens Telephone Co. v. Public Service Commission, 247 S. W. (2d), 510, the Kentucky Court of Appeals stated at page 513:
“In addition, the commission found that the company bills its customers in advance, and that the com *405 pany accrues its taxes on a monthly basis. The tax accruals themselves would provide sufficient cash for working capital requirements. The investors have not contributed any money for working capital purposes. Under these circumstances, the commission did not act unreasonably or unlawfully in disallowing the working capital item. ’ ’
In Chicopee Mfg. Co. v. Public Service Commission, 93 A. (2d), 820, 826, the New Hampshire Supreme Court stated:
4 4 If it is true that the rate payers are in fact providing current funds to the company through prepayments for income taxes which may be held and paid out at a much later date by the company, a deduction of average income tax accruals from the working capital allowance may be proper. Where the rate payers provide such funds, it is not proper that the stockholders should be allowed a return on them by including them in the rate base.”
In Chesapeake & Potomac Telephone Co. v. Public Service Commission, 201 Md., 170, 93 A. (2d), 249, the Maryland Court of Appeals stated at page 256:
4 ‘ * * * rates are calculated to yield a profit over and above taxes and the tax burden is shifted to the customers. Since these advance payments are available for current use until they become payable to the taxing authorities, there is no need to allow earnings upon a cash balance without regard to tax accruals. If allowed, there would be a duplication in a charge already made against the rate-payer. ’ ’
The company admits that in certain jurisdictions tax accruals in excess of the utility’s allowance for cash working capital and for materials and supplies are used to offset the allowance for cash for working capital and for materials and supplies.
We are of the opinion, and so hold, that customers’ contributions in the form of accruals for the payment *406 of taxes, deposits to secure the payment of customers’ bills for services or as advances on installation charges, and collections for rents to be paid at future dates, which will be constant with reasonable certainty in the foreseeable future and which are available for working capital and for investment in materials and supplies, should be used to offset the rate-base allowance for working capital, including the investment in materials and supplies for the normal operations of the company and for plant maintenance and repair.
The commission included an item of $959,660 in the rate-base structure for working capital. This is the Ohio intrastate portion of a $1,250,000 working capital developed for the' company as a whole. In fixing this amount the commission followed the formula approved by this court in City of Columbus v. Public Utilities Commission, 154 Ohio St., 107, 93 N. E. (2d), 693. The inclusion of $959,660 in the rate-base structure as an allowance for cash working capital is not unlawful or unreasonable. As hereinbefore stated the amount of any accruals, which is constant and which is available with reasonable certainty in the foreseeable future and not invested in materials and supplies, should be used to offset any allowance for cash working capital.
On July 1, 1952, which is the date certain in these cases, the company had materials and supplies on hand in the total amount of $1,010,884. Of this amount, $805,870 was allocated to Ohio intrastate business. The commission allowed this entire amount, allocated to Ohio intrastate business, to be included in the company’s rate-base structure.
The appellants contend that the major portion of such materials and supplies is not used for maintenance and repairs, but is used for new construction, extensions and additions, and such portion should not be included in the rate-base structure.
It is proper to include in the rate-base structure a *407 reasonable sum to cover the company’s investment in materials and supplies for the normal operations of the company and for maintenance and repair purposes. But we know of no valid reason why an allowance should be made in the rate-base structure for investments in materials and supplies for new construction, extensions and additions, as distinguished from normal operations and plant maintenance and repair. The cost of materials and supplies held for new construction, extensions and additions may be capitalized in the rate-base structure, when such materials and supplies are in actual use. Prior to such actual use such property can not be considered as being “used and useful for the service and convenience of the public,” as required by Section 499-9, General Code.
The appellants offered evidence to show that approximately 90 per cent of the inventory of materials and supplies is, and will be, used for new construction, extensions and additions. The company’s inventory and appraisement filed with the commission does not show what specific property is in the materials and supplies account, or for what it is to be used. The company’s evidence on this point is to the effect that the material and supplies account does not include materials to be used to construct large additions or buildings or large private branch exchanges.
In view of this state of the record, we must conclude that the company did not submit sufficient basic evidence, as required by Section 499-9, General Code, to prove its claim that all its inventory of materials and supplies is necessary and will be used for the normal operations of the company and for ordinary maintenance and repair.
In view of our conclusions on the foregoing issues, we find it unnecessary to pass upon the other errors assigned.
The final orders of the commission, dated May 28, *408 1953, and August 6, 1953, are reversed, and the causes are remanded to the commission for further proceedings in accordance with this opinion.

Orders reversed.

Weygandt, C. J., Middleton, Taet, Hart, Zimmerman and Stewart, JJ., concur.