50 So.2d 887 (1951)
JACKSONVILLE GAS CORP.
v.
FLORIDA R.R. & PUBLIC UTILITIES COMMISSION.
Supreme Court of Florida, en Banc.
January 5, 1951.
Rehearing Denied March 14, 1951.
*888 Elliott Adams and Wm. H. Rogers, Jacksonville, for petitioner.
Lewis W. Petteway, Tallahassee, D. Fred McMullen, Tampa, and Guyte P. McCord, Jr., Tallahassee, for respondent.
Baker & Thornal, Orlando, for Florida Utilities Corp.
Patterson, Freeman, Richardson & Watson, Jacksonville, Macfarlane, Ferguson, Allison & Kelley, Tampa, Yonge, Whiteside & Prunty and Walton, Hubbard, Schroeder, Lantaff & Atkins, all of Miami, Giles J. Patterson, Jacksonville, Howard P. Macfarlane, Tampa, T.A. Whiteside, Miller Walton and S.O. Carson, all of Miami, William M. Madison and O.O. McCollum, Jr., Jacksonville, for City of Jacksonville.
Holland & Runyon and Harris, Barrett, McGlothlin & Dew, all of St. Petersburg, and Leroy B. Giles, Orlando, amici curiae.
THOMAS, Justice.
In accordance with Chapter 8974, Sp. Laws of Florida, Acts of 1921, authorizing the City Commission of Jacksonville to establish rates for gas consumed in the city so as to afford adequate compensation to the producer, the commission fixed the charges that could be exacted by the Jacksonville Gas Corporation. Being dissatisfied with the amounts set by the commission, the company appealed direct to the Railroad and Public Utilities Commission of the State of Florida, and this commission thereupon heard the matter de novo, computed the "original cost" of petitioner's property, and sanctioned the gross income necessary to insure a return of seven per cent on that sum.
At the hearings the petitioner insisted, as it does now, that the basis for establishing the income to be authorized should be the "reproduction cost new," or, as otherwise stated, "original costs trended by present day price ratios," while the respondent held, and now maintains, that the rate should be based on the original cost of the property. Under both theories depreciation is taken into account. According to petitioner's theory the value of its property is approximately $4,600,000; under respondent's theory, $3,000,000; a sizeable disparity.
So it seems that we are importuned to decide whether the criterion for the determination of rates legally to be charged for the utility should be what we shall call "actual cost" or "present fair value." Though we do not propose to beg the question, we do not believe this litigation may be determined by simply choosing one of these theories and committing the respondent to it.
From the briefs and arguments the respective stands taken by petitioner and respondent are apparent. The one states that we have decided the point, that nothing we have announced since indicates a change of our view, and that a recent opinion of the Supreme Court of the United States, presently to be discussed, is not controlling, though conflicting. The other insists that we are not committed on the subject, having lately indicated an attitude conforming to its contention, and that, anyway, the Supreme Court of the United States has settled the matter.
In order more clearly to understand the position of the respondent it seems fitting that we should preface our comment with a condensation of the salient parts of the order assailed in the petition for certiorari.
In the order it was recited that "it should be borne in mind that neither this Commission [respondent] nor the City Commission * * * in fixing just and reasonable rates to be charged * * * is bound by any particular statutory method or formula to be used in arriving at the valuation of the gas company's property," and further: "The fair value method, with its twin of reproduction cost new, of rate making was in vogue throughout this country from 1898 to 1944 as a result of the decision of the Supreme Court of the United States in the case of Smyth v. Ames, 169 U.S. 466 [18 S.Ct. 418], 42 L.Ed. 819, wherein the court came to the conclusion that the Constitution required the fixing of rates so as to yield a fair return on the fair value of the *889 property used and useful in the public service." But, the order continued, the "regulatory bodies * * * are no longer bound by the decision in Smyth v. Ames, supra, because an enlightened court in the case of Federal Power Commission v. Hope Natural Gas Co., 320 U.S. 591 [64 S.Ct. 281], 88 L.Ed. 333, effectively overruled Smyth v. Ames and sounded the death knell of the fair value doctrine." This had been the attitude of the commission during the progress of the trial when, upon motion of the city attorney, there was struck from the record all evidence of present value because the commission thought it was "entitled to no consideration in a rate case," since under its construction of the opinion in the Hope case "regulatory bodies are free within the scope of their statutory authority to fix just and reasonable public utility rates without regard to the fair value formula."
Feeling that it was unfettered in choosing the method to be employed in establishing a return that would be, in itself, "just and reasonable," the Railroad and Public Utilities Commission then took as a base the actual cost, and after allowing for all anticipated expenses of operation, replacements, depreciation, and so on, arrived at a total income that would yield a net return on that amount of seven per cent.
Adverting now to the insistence of the petitioner that we have already decided, by our holding in Tampa Electric Company v. Watson, 146 Fla. 695, 1 So.2d 739, 744, that "present fair value" is the basis of which rates must be computed, we come upon what appear to be essential differences in the facts there and here. We said in that case that the utility board of Tampa was "justified under the statute [Chapter 20160, Laws of Florida, Special Acts of 1939] in using the present `fair value' of the applicable property as the basis of valuation for rate-making purposes instead of using the actual cost or investment value and making deductions or additions for depreciation or betterments." But it does not follow that the language there approving what had been done by the utility board under Chapter 20160 becomes a precedent in the present controversy because not only was it provided in that law that rates should be "just and reasonable," but also that the board was "prohibited from making any rate" which would not "give to the utility a return on its real and legitimate investment * * * of at least 7% on said investment * * *." (Emphasis supplied.) So when the provisions are read together it would seem that the rates to be determined were not only to be "just" and "reasonable," but were to produce not less than seven per cent of the "real and legitimate investment." Thus the law there dealt with and the one here involved are not the same because of the injunction against the board's fixing rates below an arbitrary percentage and the reference to real and legitimate investment, although they do have the common provision that the amounts must be "just and reasonable."
The challenge of the respondent of the position taken by the petitioner that the court decided the point in the Tampa case and embraced the "present value" as distinguished from the "actual cost" doctrine has sent us to the original file in the Tampa case, where we have not found to have been presented the clean-cut issue between the two theories one would expect from the reported case. No testimony had been taken, and the matter reached us on an order striking parts of the bill of complaint, and the plaintiff, the utility company, preferred an appeal over an amendment of the pleading. The representation to the court was that the plaintiff should be entitled to a return on its property devoted to the operation of a street railway as well as that used in the distribution of electricity to its customers. Actually that seems to have been the prime issue in the case.
It was further urged that the utility board had not followed the proper course in adopting as a basis for the rates to be fixed the report of the engineers it employed showing an "appraised" cost of $4,264,178 and a "book" value of $4,528,473. According to a copy of the report attached to the bill, the first figure was reached from an inventory and appraisal made by the engineers, supplemented by an estimate of the value of the real estate made by appraisers of the board; and the second figure was "predicated on the Original Cost of the *890 property * * * as determined from the books and records of the company * * * referred to as the `Book Cost.'" (Emphasis supplied.) It is true that the company alleged a figure of twice as much, but search as we may, we have not discovered in the pleading whence it came or how it was determined; therefore, so far as the facts reflected in the pleadings of that case are concerned, including the exhibits, we have concluded from a thorough re-examination of the record that although the trial judge referred to "present fair value" in his opinion and we did the same in ours, it was a reference to the term without distinguishing it from "actual cost," except verbally. The question seems to have developed hypothetically.
In other words, the engineers had given two figures resembling "present value" and "actual cost," which they called "appraised cost" and "book cost," respectively, and between which there was relatively little difference; even so, the board had actually adopted a figure larger than either. Compared to the three figures was the sum alleged by the utility company, the origin of which cannot be ascertained from the record.
Now the immediate question is whether, in all the light cast upon this controversy, currently and often debated amongst experts in economics, we are so unalterably committed to the "present value" doctrine, because of the decision in the Tampa case, that we should now dispose of the present litigation with the mere statement that we have cast the lot of utility commissions with those who advocate the basis of "present value" in Florida and that there is no further occasion to trouble ourselves about it.
We cannot agree that any holding in the Tampa case that the apparent action of the utility board in adopting "present fair value" as a basis for rates was justified, the language was so unequivocal and the line of demarkation between the two methods and their results so plainly defined, despite the difference in the language of the acts and in the facts alleged there and present here, that thenceforward "present fair value" should in all circumstances and in all cases be the proper measure to the exclusion of "actual cost."
We do not have the conviction that we may dismiss the points presented in the instant controversy simply by saying that we are bound by the decision in the Tampa case and that because of it we should quash the order of the Railroad and Public Utilities Commission and direct that body to substitute the figure of $4,600,000 for $3,000,000 and proceed to a computation on that basis. To do so would not bring the effect that would at first glance seem inevitable. It would not result in the simple substitution of figures and the rearrangement of sums, quotients, and products without regard for the eventual net income, as we shall presently demonstrate.
Concluding as we do that the cited case does not bind us to a decision in the present one, there is no need to discuss the effect on that opinion of the decision in Cooper v. Tampa Electric Company, 154 Fla. 410, 17 So.2d 785.
We now reach in its order the problem of the effect the opinion of the Supreme Court of the United States in Federal Power Commission v. Hope Natural Gas Company, supra, should have upon our decision.
It appears from the report of this case that the Federal Power Commission had applied the yardstick of "actual legitimate cost" in arriving at the basis upon which the rates should be fixed, and its order was set aside by the Circuit Court of Appeals, 4 Cir., 134 F.2d 287, because that tribunal thought the "rate base should reflect the `present fair value'" and that "`actual legitimate cost' (prudent investment) was not the proper measure of `fair value' where price levels had changed since the investment."
Congress had provided in the Natural Gas Act, 15 U.S.C.A. § 717 et seq., that the rate should be "just and reasonable," and it was in the determination of this figure that the question arose about the proper method to be adopted  "actual cost" or "present value." The commission had chosen the first; the Circuit Court of Appeals, the second. When the matter got to the Supreme Court of the United States, the ruling of the Circuit Court of Appeals was *891 reversed because of the conclusion that fixation of the rates on the basis of "actual cost" instead of "reproduction cost or trended original cost" could not be said to be unjust or unreasonable. We see no occasion to elaborate to any appreciable extent on that opinion or, for that matter, to go into much detail about its apparent conflict with what we had decided to the contrary, for from what we have already written and from our comment to follow, it will be seen that there is no real inconsistency and none will arise from our holding here. We would not be governed by the decision in the absence of a question involving the Constitution of the United States, and it therefore now becomes persuasive authority for which we have considerable respect.
In summary, we do not agree that we have decided the precise matter now brought into focus in this litigation, and not having decided it, no question arises about our having later expressed a contrary view or of the decision of the Supreme Court of the United States having set us upon a different course from that which we had at one time traveled.
In an earnest effort on our part to obtain reliable, logical information in the field of economics to determine the fair means of establishing rates where there is supervision by the people of industries furnishing utilities to the public, we have been astonished at the wide difference of opinion and the irreconcilable attitudes of those advocating on the one hand "present value" and those furthering on the other hand "actual cost" as the true starting point. We have not searched into the far corners of the field because we think it is necessary to keep in mind the proposition that, after all, it isn't the purpose of this court to fix the rates, but only to review what has been done by bodies thus empowered to determine whether they have gone so far astray as to violate the statute or to run afoul of the guarantees of the Constitution, an extreme which would warrant us in saying that the essential requirements of law had not been followed.
With almost equal plausibility the champions of "actual cost" and of "present fair value" advance their causes. We have examined the issues in the light of the law governing the determination of values where property is taken in eminent domain and it is necessary to render the owner "just," under one Constitution, and "full," under the other Constitution, compensation, but we have concluded that this is not a fair test because of the very nature of the business of furnishing some product for the use of the public which thereby brings the producer under governmental supervision.
It is necessarily true that no one is undertaking to deprive the owner of the actual plant, and even though income be considered as property which may not be taken without due process of law, nevertheless that guarantee is not brought into play so long as the return is "just" and "reasonable," and here again our thinking returns to the place of beginning.
One of the principal arguments for the adoption of the "actual cost" plan is that cost is so much more definite and so much more easily ascertained, being from its very nature an unchangeable figure. The argument that this should be the procedure because it is easier does not appeal to us, for, certainly, justice should be ferreted out no matter how difficult the process.
We have thought too of valuing such property from time to time as property is valued from year to year for the purposes of taxation, theoretically at actual cash value, but we all know the results thus obtained are not too exact. Then the thought immediately arises that rearrangement of the figures forming the basis for the rates to be charged great numbers of consumers of a utility is a ponderous, difficult, complex procedure that cannot be frequently accomplished without great expense and delay, and after duly considering that we have been even more inclined to abandon the idea.
So there seems to be no method of fixing the amount  certainly none has been *892 adopted by experts in the field with anything even approaching unanimity  which, exclusive of operating costs, replacements, and the like, would be so precise that any sum less than that could be said to bring results that would be unjust and unreasonable; and, illogical as it may seem at first, the rate-making body might select either plan, to which we have so often referred, and come up with a result that the court could not condemn. This is true because there is ever present one element, that is, the percentage of return which may fluctuate within the boundaries of reasonableness and justness. For example, were we to quash the order in this case and direct the respondent to proceed to base the rates on the "present value" of $4,600,000 instead of the "actual cost" of $3,000,000 and the respondent were then to allow a net income of 4 1/2 per cent, the total return would be approximately the same, and we would then, if the jurisdiction of this court were invoked, be faced with the problem of the reasonableness and the justness of the lesser percentage considered under the conditions existing today, including the circumstances of the money market.
It was the commission's view that it should be "free to follow such method * * * as [it] may choose so long as the end results are rates which are just and reasonable." (Emphasis supplied.) This thought too may have been prompted by the decision in Federal Power Commission v. Hope, supra, because the author of it had the idea that the "end result" could not be condemned and that "`fair value' is the end product of the process of rate-making not the starting point as the Circuit Court of Appeals held." [320 U.S. 591, 64 S.Ct. 287.] At first we were disposed to criticize such reasoning because we thought one could not evaluate a conclusion without examining the course followed in reaching it; in other words, the product of .07X could not be judged properly without isolating and defining "X." But upon further study we became convinced that the "end result" is to be weighed in terms of justness and reasonableness, having consideration for all circumstances that in the sphere of finances affect and influence investments of this sort. This so-called "end result" is made fluctuant by the variant in percentage and the flexibility of justness and reasonableness.
From an intense study of this litigation in the light of applicable statutes and decisions dealing with the subject, it is patent that the criterion, as indistinct and inexact as it may be, is the justness and reasonableness of the earnings to be computed. These qualifications are ever present, and it is rates of this character that the utility board is charged with finding. It is not our province now in a certiorari proceeding constituting a challenge of the action of the respondent to decide anew whether we are disposed to join the "actual cost" school or the "present fair value" school or to enjoin the commission to accept one and reject the other, but whether, in all attendant circumstances, we should interfere with the commission's findings because, in adopting the one and discarding the other, the commission thereby came to a conclusion which, in terms of dollars the petitioner was allowed to earn, was unjust and unreasonable.
The more we consider the problem the more we are convinced that it is necessary to become wedded neither to one doctrine nor the other, and we think an analysis of the very situation here involved illustrates the point.
Let us consider who are the terminal persons immediately interested in the rate. Obviously one is the payer, that is, the consumer; the other is the payee, the stockholder. Of the approximately $1,300,000 computed as the gross earnings the company should receive, all but $130,000 is for expenditures such as operating costs and the like, which are static and will not be increased or diminished whether the base is the "actual cost" or the "present value." The same is true of the interest which must be paid to the bondholders. The question then arises: What rate would be just and reasonable, not only to the consumer but also to the producer?
In the present case what would happen were we to say that the respondent should substitute the "present value" of $4,600,000 *893 for the "actual value" of $3,000,000, leaving the percentage of return, like all other figures, such as operating and maintenance costs, depreciation and taxes, unchanged? The gross income would be increased $112,000 and this sum would be funneled into the pockets of the stockholders, with the result that their part of the revenue would become $242,000 instead of $130,000, an increase of more than 86 per cent, and this is what would be earned on 36,466 shares of outstanding common stock of the par value of $5.00 the share, so that each share would earn $6.65 instead of $3.58 under the original figure.
In this connection it is interesting to note the history of dividends per share for the years 1944-1948. In the first four of these years the dividends paid were $1.25 a share and in the last year, $1.40.
How are we to say, then, when we consider the entire financial structure of the petitioner, trace the funds to be received by the stockholders, and compare this income ultimately to be enjoyed by them with what has heretofore been earned, that we should interfere with the finding of the respondent simply because that commission took a base figure of "actual cost" instead of "present value"?
In conclusion, we realize that we may appear to have wended our way through both territories and to have toyed with each theory without definitely allying ourselves with either. But from a view of the whole situation, we are convinced that fairness and reasonableness may be meted out to consumer and investor by gauging the amount the latter is to receive on the basis of the "actual cost," a figure which obviously is more accurate than "present value" based on estimate, and more stable when value is so affected by changing conditions, and that these changes may be compensated from time to time by varying the percentage of return so that the holder of a share of stock will receive an amount to which he is at the time fairly entitled.
As for the only other question which seems to merit discussion, namely, the discrepancy between the amount actually expended for 1949 and the amount anticipated to be spent during that period, we do not think it necessary to grant the petition and quash the order, with directions to reconsider that matter, but shall leave it for such consideration as future rate-making bodies shall see fit to give it when next the determination of rates reaches them.
The petition for certiorari is denied.
ADAMS, C.J., and TERRELL, CHAPMAN, SEBRING, HOBSON and ROBERTS, JJ., concur.