UNITED GAS CORPORATION *v.* MISSISSIPPI PUBLIC SERVICE COMMISSION

No. 41777 February 20, 1961 127 So. 2d 404

406

408

*Brunini, Everett, Grantham & Quin,* Jackson; *Wilkinson, Lewis, Madison & Woods, W. O. Crain, E. J. Freiberg,* Shreveport, for appellant.

412

*Joe T. Patterson,* Attorney General, *Wade H. Creekmore,* Asst. Atty. Gen., *Fred M. Bush, Jr., Thos H. Watkins,* Jackson, for appellee.

240

ETHRIDGE, J.

This is a public utility rate case. Appellant United Gas Corporation (United) operates a natural gas distribution system in Mississippi. The issues include determination of the rate base and rate of return, allowed Unit-

ed by the Mississippi Public Service Commission (Commission). We affirm that part of the order using net investment or original cost less depreciation for the rate base, but reverse the Commission's actions in disallowing as operating expenses the cost of an employees' stock purchase plan, modest contributions to charities, wage and postage increases, and also the disallowance as an operating expense of increased gas purchase costs to United, resulting from its supplier's bonded and filed rate increases with the Federal Power Commission (FPC). Accordingly, this case is remanded to the Commission for proper allowance of these items as operating expenses, and redetermination of a fair and reasonable rate of return.

On June 16, 1958, United filed with the Commission notice of proposed changes in its rate schedules for natural gas service. Public Utilities Act of 1956, Miss. Laws 1956, Ch. 372, Sec. 10; Miss. Code 1942, Rec., Sec. 7716-10. They became effective August 1, 1958, under a refunding bond as authorized by statute. Miss. Laws 1956, Ch. 372, Sec. 10. Public hearings were begun on August 19 and, with several recesses, were concluded on November 26, 1958. On December 15, 1958, the Commission entered its opinion and order, which is here under review, setting aside and annulling the proposed increase in rates. United then appealed to the Chancery Court, First Judicial District of Hinds County, which on July 19, 1960, affirmed the Commission's order. This appeal followed. The increased rates have been continued under bond for refund if finally disallowed.

United is a Delaware corporation authorized to do business in Mississippi and other states. For many years it has been engaged in the business of distributing and selling natural gas to the public by means of distribution facilities and equipment located in this state. Retail natural gas service is supplied by United in Mississippi

to more than 70,000 customers in 67 cities and towns and also various unincorporated and rural communities.

Before the bonded rates went into effect, it furnished natural gas service under 30 different rate schedules. The bonded rates replaced the 30 rate schedules with 4 new ones. The Commission said the over-all effect of the proposed rates would be an increase of $1,764,000.00 a year, based on operations during 1957, or about 32 percent for all classes of customers in Mississippi, but more in some areas and less in others.

United has not increased the price of gas to its domestic and small commercial consumers in Mississippi during the 25 year period in which it has furnished this service. The Commission found that the company's capital structure is "prudent and sound." It compares "favorably with that of other well-managed natural gas companies." Apparently United is an efficiently managed public utility.

Appellant is a multi-state corporation with total assets, as of December 31, 1957, of $572,074,858.59. It operates natural gas distribution facilities, and also owns other corporate stock. It has two wholly owned corporate subsidiaries: Union Producing Company (called Union) and United Gas Pipe Line Company (called Pipe Line). Union explores and produces oil and gas. Pipe Line purchases gas from producing fields and transports it in interstate commerce to various markets through its pipe lines. United purchases from Pipe Line all of the gas distributed by United in Mississippi. In this case we are not concerned, except indirectly, with the out-of-state operations of United, or with the interstate operations of Union and Pipe Line. However, as will be considered subsequently with reference to operating expenses, the rates charged by Pipe Line for the gas which it sells United, under schedules filed with the FPC, raise the principal question with reference to operating expenses.

United's gas distribution system consists of distribution mains of various sizes, district regulators to control pressure, services (the pipe connection between the distribution main and the customers' premises), meters and service regulators. General property necessary to maintain and operate the business in Mississippi includes automotive and other miscellaneous equipment, as well as office buildings, warehouses, and service centers at various locations. As of December 31, 1957, United Gas owned in Mississippi 1,212 miles of distribution mains ranging in size from ¾ inch to 12 inches, 75, 688 meters of various makes and sizes, and 108 automobiles and trucks.

The Public Utilities Act of 1956, Ch. 372, Miss. Laws 1956, provides in Sec. 8(a): ''No rate made, deposit or service charge demanded or received by any public utility shall exceed that which is just and reasonable. Such public utility, the rates of which are subject to regulation under the provisions of this act, may demand, collect and receive fair, just and reasonable rates for the services rendered or to be rendered by it to any person. Rates prescribed by the Commission shall be such as to yield a fair rate of return to the utility furnishing service, upon the reasonable value of the property of the utility used or useful in furnishing service.''

Section 11 states: ''Whenever the commission, after hearing had on reasonable notice finds that the existing rates in effect and collected by any public utility are materially excessive or insufficient or unreasonably discriminatory, or in anywise in violation of any provision of law, the commission shall determine the just and reasonable rates which will yield a fair rate of return to the utility for furnishing service, . . . .''

Section 12 pertains to the rate base: ''In regulating the rates of any public utility hereunder, the commission shall, on hearing after reasonable notice, ascertain and fix the rate base of the property of the public utility when the same is relevant or material to the exercise of

the jurisdiction of the commission, and may make read-justments from time to time and ascertain the cost of all new construction, extensions and additions to the property of every public utility. In arriving at such rate base the commission shall give due consideration to all elements that are generally considered in determining the rate base for rate making purposes.''

These statutory provisions define and fix the powers of the Commission in regulating the rates of public utilities.

## I. The Rate Base

 █ The leading case in this state on utility rate regulation is Southern Bell Telephone & Telegraph Co. v. Mississippi Public Service Commission, 237 Miss. 157, 113 So. 2d 622 (1959) (sometimes called the Mississippi Southern Bell Case). It was there held that the Mississippi statutes do not bind the Commission to the use of any particular formula in determining the reasonable value of the property of a public utility for rate making purposes. There are a number of useful formulae, including depreciated original cost, sometimes known as net investment, or original cost less depreciation; reproduction cost of the property less depreciation; depreciated prudent investment; trended original cost less depreciation; and others. The statute simply provides that the rate prescribed shall be such as to yield a fair rate of return upon the reasonable value of the property used and useful in furnishing service. The 1956 Act does not impose upon the Commission requirement that the so-called fair value formula of Symth v. Ames, 169 U. S. 466, 18 S. Ct. 418, 42 L. Ed. 819 (1898), with its emphasis upon reproduction cost new, should be adopted as the measure of the rate base. Evidence of reproduction cost new less depreciation is admissible in a hearing on a rate case, but its probative value is primarily to be determined by the Commission. It is not required to ac-

cept this opinion evidence without appraisal, but can weigh it and evaluate it.

In the Mississippi Southern Bell Case the Commission admitted opinion evidence on reproduction cost new, but after considering it, concluded the evidence was conjectural, speculative, unrealistic and unreliable. Hence the agency rejected that evidence, and fixed that rate base on original cost less depreciation. That action was affirmed by this Court. 237 Miss. at 218, 227-228. Essentially, the same thing was done by the Commission in the instant order of December 15, 1958.

United proposed a test period designated as the year of 1957. At the beginning of hearings in August 1958, operating results were available for the first six months of 1958, and were submitted to the Commission's staff. The Commission took the position that it should consider, in its determination of the rate base and rate of return, the year 1957 and also the first six months of 1958. It stated that the company's most recent operating experience was entitled to "substantial weight." This is true, provided there is a valid projection of revenue and expenses for the balance of the year. However, since the case will be reversed and remanded, the seriously disputed issue as to whether the Commission properly normalized these factors for the last six months of 1958 will not reoccur. Hence it is not necessary to pass on that question.

Rate-making is essentially a legislative function, delegated to the Public Service Commission, unless the rates established by it are confiscatory or violate constitutional or statutory standards. Mississippi Public Service Commission v. Home Telephone Co., Inc., 236 Miss. 444, 110 So. 2d 618 (1959); Miss. Southern Bell Case, supra. The order of the Commission should be affirmed if there is substantial evidence to support its decision, and if it conforms to statutory and constitutional criteria.

The evidence for United suggested the following available rate bases:

| | |
|---|---:|
| Original cost, less depreciation: | $10,671,276.00 |
| Reproduction cost new, less depreciation | 15,991,983.00 |
| Trended original cost depreciated | 19,913,653.00 |

Appellant contends that, giving due consideration to these figures, and equally balancing between original cost and reproduction cost new that portion of the property not subject to a readily ascertainable market value, the reasonable or fair value would be not less than $12,780,-131. It is said that utilizing reproduction cost new, less observed depreciation and certain elements involving original cost, the fair value rate base should be $13,565,-595. On the other hand, the Commission considered the testimony offered by United, and concluded that the evidence relating to reproduction cost and depreciation in the property was "unrealistic, unreliable, conjectural, and speculative." Hence it refused to give any weight to United's evidence on reproduction cost new, less observed depreciation, and trended original cost, less observed depreciation.

It would serve no purpose to make a detailed analysis of the valuation evidence offered by United concerning reproduction cost new and observed depreciation. After carefully considering it, we are of the opinion that the Commission was warranted in attributing little value to the evidence on these items. The Commission found that United's witnesses gave no consideration to functional depreciation, which comprehends such factors as obsolescence and inadequacy; and the sampling process of inspecting 250 out of 13,282 tinned meters was inadequate. This sampling process was conducted by Spencer and three assistants, requiring about a month in 1956 and 8 days in 1958 for a recheck. For example, out of a total of 5,702,929 linear feet of "treated and wrapped steel

pipe'', having an estimated reproduction cost of $6,698,-538.00, about 38 percent of the estimated reproduction cost of the entire property, only about 2,000 feet were inspected, or less than 1/10th of 1 percent. Similarly, a low percentage inspection was made of other types of pipe, and of other items. Moreover, Wright, who estimated the reproduction cost of the company's property as of December 31, 1957, said he based this on present day prices of materials and labor. He employed an itemized inventory prepared by United, and made no effort to spot-check its accuracy in the field, or to appraise any elements of obsolescence.

Other items of observed depreciation offered by appellant's witnesses of dubious value are: The percentage of error in the performance of work crews making the inspections; the failure to inspect any of 62,446 iron and alloy gas meters; the attempted estimates of installation costs of meters; the undetermined ages of the regulators; the existence of nonstandard equipment in United's present plant, and the assumption it would be rebuilt on that same basis. McElfresh utilized the testimony of Spencer and Wright in arriving at his estimate of a fair value rate base of $13,565,595.00 as of December 31, 1957.

The fallacy of the observed depreciation method in determining accrued depreciation has been well documented in many decisions. This is particularly true as to a public utility with a large part of its plant underground, where a limited sampling process only can be used. The method tends to result in arbitrary conclusions based upon superficial evidence of physical deterioration as to a small percentage of the plant. This is illustrated here by the limited samples of underground pipe and of above-ground meters. Moreover, the method tends to be inherently fallacious in confusing the appearance of the physical condition of property with true depreciation, which includes the using up of its economic

or service life. Re: Interstate Natural Gas Co., Inc., 48 PUR (NS) 267, 275 (1943 FPC); Re Safe Harbor Water Power Corp., 66 PUR (NS) 212 (1946 FPC).

■■ In addition to the above infirmities as to observed depreciation, the cost of reproduction reflects a theoretical reproduction of something which, if it did not already exist, would never be reproduced in its present form and location. Reproduction cost new fails to give the customer the advantages of such facilities, but charges him rates for them. It is based upon an estimated price level with a hypothetical construction force. Assuredly it is within the province of the Commission to determine the weight to be given to this evidence, the reliability of the estimate and opinions, and the credibility of the witnesses. New Jersey Bell Telephone Co. v. Board of Public Utility Commrs., 12 N. J. 568, 97 A. 2d 602, 100 PUR (NS) 379 (1953); Long Island Lighting Co., 18 PUR (NS) 65 (1935), affirmed in Long Island Lighting Co. v. Maltbie, 249 App. Div. 918, 292 N. Y. Supp. 807, 18 PUR (NS) 225, (1937); Wisc. Telephone Co. v. Public Service Comm., 232 Wisc. 274, 287 N. W. 122, 30 PUR (NS) 65 (1939); Railroad Comm. of California v. Pacific Gas and Elec. Co., 302 U. S. 388, 58 S. Ct. 334, 82 L. Ed. 319, 21 PUR (NS) 480; Citizens Water Co. v. Pacific Public Utility Comm., 181 Pa. Super. Ct. 301, 124 A. 2d 123, 14 PUR (3d) 496 (1956); Narragansett Electric Co. v. Kennelly, 143 A. 2d 709, 25 PUR (3d) 54 (R. I. 1958); Jacksonville Gas Corp. v. Railroad and Public Utilities Comm., 50 So. 2d 887, 88 PUR (NS) 420 (Fla. 1951); Federal Power Comm. v. Natural Gas Pipeline Co., 315 U. S. 575, 62 S. Ct. 736, 86 L. Ed. 1037, 42 PUR (NS) 129 (1942); see also Priest, Major Public Utility Decisions in Perspective, 46 Va. L. Rev. 1327 (1960).

■■ In the Mississippi Southern Bell Case this Court upheld a rejection of evidence of reproduction cost new evidence, as conjectural and unrealistic, commenting

particularly upon the fallacies of observed depreciation as to a large telephone company. 237 Miss. at 227-236. That case is pertinent to the instant one, and, for the reasons stated, we conclude appellant's evidence on reproduction cost new less observed depreciation was justifiably rejected.

 The Commission next considered the evidence offered by appellant, and some by the Commission, on United's net average investment in Mississippi during the test period. It eliminated three of the items asserted by appellant to constitute a proper part of its net average investment for rate-making purposes, and determined that United's net investment rate base, for the year ended December 31, 1957, as adjusted, was $9,249,-913.00; and for the six months ended June 30, 1958, it was $9,630,286.00. The Commission's action in this respect is described by the two following tables:

Table 1

UNITED'S NET AVERAGE INVESTMENT DURING TEST PERIODS

| | Average | |
| | Year ended Dec. 31, 1957 | 6 mos. ended June 30, 1958 |
| --- | --- | --- |
| Gas plant in Service | $12,429,960 | $13,154,184 |
| Construction Work in Progress | 165,898 | 315,855 |
| Gas Plant Acquisition Adjustments | 19,710 | 27,520 |
| Materials and Supplies | 559,558 | 560,221 |
| Cash Requirements | 211,120 | 188,125 |
| Total Gross Investment | $13,386,246 | $14,245,905 |
| Reserve for Depr. and Amortization | 2,511,620 | 2,701,313 |
| *Net Investment* | $10,874,626 | $11,544,592 |

## Table 2

UNITED'S NET AVERAGE INVESTMENT RATE
BASE, AS ADJUSTED BY PUBLIC SERVICE
COMMISSION

Average

| | Year ended Dec. 31, 1957 | 6 mos. ended June 30, 1958 |
|---|---|---|
| *Net investment (supra)* | $10,874,626 | $11,544,592 |
| Eliminations: | | |
| Contributions in Aid of Construction | 1,116,900 | 1,180,489 |
| Construction Work in Progress | 165,898 | 315,855 |
| Working Capital Credit | 341,915 | 417,962 |
| | $1,624,713 | $ 1,914,306 |
| *Net Investment Rate Base* | $ 9,249,913 | $ 9,630,286 |

The first item in Table 1, designated "Gas Plant in Service", includes as a component "Contributions in Aid of Construction" in the amounts of $1,116,900 and $1,-180,489 for the year ended December 31, 1957, and for the six months ended June 30, 1958, respectively. The Commission found that these sums represented contributions by gas customers to meet construction costs, and it was inequitable to require consumers to pay the utility a return on such contributions. This appears to be the general rule recognized by regulatory agencies and courts. Hagerstown v. Md. Public Serv. Comm., 217 Md. 101, 141 A. 2d 699, 24 PUR (3d) 295 (1958). It is said to be unfair to require consumers to pay to the utility a return on property which they, not the utility, have

paid for. Rhode Island Public Utilities Comm. v. East Providence Water Co., 48 R. I. 376, 136 A. 447 (1927); City of St. Francis v. Wisc. Public Serv. Comm., 270 Wisc. 91, 70 N. W. 2d 221 (1955); Sutter Butte Canal Co. v. Railroad Comm. of Calif., 202 Calif. 179, 259 P. 937 (1927). Somewhat analogous to this excluded item from the rate base are the exclusions in the Mississippi Southern Bell Case of telephone plant under construction, 237 Miss. 208-210, 236, and materials and supplies and cash requirements, 237 Miss. at 208-210, 236-237, which are discussed subsequently. Hence we find no error in the exclusion of contributions in aid of construction.

■■■ The second adjustment made by the Commission in appellant's net investment rate base is set forth in both of the above tables as "Construction Work in Progress." During the year ended December 31, 1957, and the six months ended June 30, 1958, this item amounted to $165,898.00 and $315,855, respectively. While the construction work is in progress, United charges interest at the rate of 6 percent per annum on cost of funds devoted to this purpose. When the work is completed and the plant is put into service, its entire cost, including interest, taxes and other overhead, is capitalized. Hence the Commission concluded, correctly we think, that the company could suffer no injustice by the exclusion of such construction from the rate base. It also noted that a substantial portion of the construction work was designed for new customers, and, if the item were placed in the rate base, the additional revenue produced should be considered; otherwise existing customers would have to pay a return on property construction for future customers. United offered no evidence as to its anticipated revenues from this construction. The exclusion of this item from the rate base is well established. Mississippi Southern Bell Case, supra, 237 Miss. at 208-210, 236; Ark. Power and Light Co. v. Ark. Public Serv. Comm., 226 Ark. 225, 289 S. W. 2d 668, 14 PUR (3d) 38 (1956).

Under Table 1, the net average investment during the year ended December 31, 1957, and the six months ended June 30, 1958, includes "Materials and Supplies", in the amounts of $559,558.00 and $560,221.00, respectively, and "Cash Requirements" of $211,120.00 and $188,125.00, respectively.

■■■ The Commission found that for these two periods there was an average monthly balance in the accrued reserve for various taxes (federal and state income, property, gross receipts, et al) aggregating $341,915.00 and $417,962.00, respectively. It reduced the amount which the company otherwise requires for working capital by the aggregate of these accruals. The record reflects that the company accrued these substantial sums in advance of their due dates, and enjoyed their use and benefit in its business. The gas customers contributed this money through their monthly bills. The Commission correctly concluded it was improper to require consumers to pay a return on funds contributed by them which were available for working capital. This adjustment was approved in the Miss. Southern Bell Case, 237 Miss. at 208-210, 236-237. There was no error in this adjustment of appellant's net investment rate base.

In short, after the stated eliminations, the Commission found that United had a net investment rate base for the year ended December 31, 1957, and the six months ended June 30, 1958, of $9,249,913.00 and $9,630,286.00, respectively. We affirm the Commission's determination of United's rate base, by the stated methods and in the stated amounts.

## II. Refusal to Adjust Net Operating Income for Weather

In determining the rate of return, the Commission outlined the operating revenues and expenses of United, and its net operating income as submitted during the two stated periods. It made certain adjustments in the op-

erating expenses, eliminating (a) supplier's bonded gas rate increases; (b) contributions and expenses relating to employees' stock purchase plan; (c) donations to charitable organizations; and (d) wage and postage increases. After disallowing these expenses, the Commission reached an adjusted net operating income of appellant under the old rates of 5.36 percent for the year ending December 31, 1957, and 7.37 percent based on an annualized, specified ratio for the year 1958. It then tested the reasonableness of the rate of return by the use of certain factors in a cost-of-capital method. It held that the rates in effect prior to August 1, 1958, were just and reasonable. Therefore it cancelled the new filed schedule of rates and charges which were in effect under bond.

The Commission recognized that the company's earnings are vitally affected by the weather. Based on 30-year statistics, the year 1957 was abnormally warmer than the statistical average, while the first six months of 1958 were abnormally colder. Appellant contends, and its witnesses testified, that the Commission, in determining the company's net operating income, should "normalize" the degree days in fixing just and reasonable rates. Many regulatory agencies do that. The phrase "degree days" is defined as the extent to which the mean daily temperature falls below an assumed base, usually 65 degrees Fahrenheit. Appellant says, and the Commission recognized, that rates which are based on normal weather conditions may actually produce inadequate earnings, depending upon the deviation in degree days from the level of normality. However, it concluded there are some infirmities in this method. It thought that, after considering all of the facts, the technique of normalizing weather was too unpredictable and uncertain to permit any reasonable accuracy. A second method was used, based on the theory that investors are cognizant of the impact of weather on the earnings of gas

utilities, and the prices they pay for gas securities in the open market reflect this risk, among others. Hence the Commission concluded that the ''optimum protection'' could be given the equity owners by allowing them a rate commensurate with the peculiar risks of the gas industry. It had previously followed this method in the 1957 Willmut Gas and Oil Company rate case. Hence it declined to make a specific adjustment in United's net operating income for the purpose of normalizing weather conditions. But it sought to allow the equity owners a ''maximum return'' based upon certain earnings-price ratios offered by Hirsch and reflected in recognized groups of gas utilities.

There was also a dispute between the company's witnesses, which selected a 5-year period for normalizing weather, and one of the Commission's witnesses, Van Scoyoc, who suggested a 30-year period. The Commission was warranted in concluding there was insufficient data to arrive at a reliable statewide norm. In view of the conflicting data, it adopted the version of Hirsch, a consultant on its staff, by seeking to provide the ''maximum earnings'' demanded by investors in related groups of utilities, in order to allow the company the ''maximum protection.'' Moreover, under Sec. 10 of the Public Utility Act, Laws 1956, Ch. 372, a public utility may obtain rate relief within thirty days, at least on a temporary basis.

We are unable to say that the Commission committed error in refusing a specific percentage adjustment for weather. Its action appears to be reasonable, with substantial evidence to support it. See Public Utility Company of Pa. v. Peoples Natural Gas Co., 6 PUR (3d) 341, 372-373 (Pa. PUC 1954); Pa. Public Utility Comm. v. Mfrs. Light and Heat Co., 5 PUR (3d) 346, 384 (Pa. PUC, 1954). However, since the case will be remanded to fix a rate of return, we do not consider the validity of the method used in allowing United a ''maxi-

mum return'', or the end-result of that method. We find no error in the Commission's refusal to normalize the degree days for weather for the test periods.

### III. Adjustments in Operating Expenses—Employees' Stock Purchase Plan, Donations to Charity, and Wage and Postage Increases

United submitted the following income data based on actual operations during the test periods:

| | Year Ended Dec. 31, 1957 | Six Months Ended June 30, 1958 |
|---|---|---|
| Operating Revenues | $5,328,984 | $4,101,856 |
| Operating Expenses (Incl. Taxes) | 5,030,596 | 3,641,441 |
| Net Operating Income | $ 298,388 | $ 460,415 |

On this basis, for the full year of 1957 United's rate of return would be 3.23 percent. However, the Commission attempted to make certain adjustments and reductions in the operating expenses of United, which, of course, would increase its rate of return. We think the Commission erred in making these adjustments, as hereafter described.

 ██ In determining the sufficiency of the rate of return, the sum required by the utility to meet its operating expenses must be considered. Miss. Public Service Comm. v. Home Telephone Co., Inc., 236 Miss. at 453; 43 Am. Jur., Public Utilities and Services, Sec. 141; 73 C. J. S., Public Utilities, Secs. 25(2), 1042.

United makes payments each year toward the purchase of its common stock on the open market for its employees. These payments are charged as operating expenses. During 1957 the contributions and related expenses totaled $25,790.00, and during the six months end-

ed June 30, 1958, they totaled $15,274.00. If any employee has worked for the company five years or more, he may use up to 10 percent of his salary to buy stock on the open market in the company, and United will pay him an equal matching amount for such purchase. The stock becomes the property of the employee. The purchase is handled through trustees.

The Commission disallowed these expenses. It stated the effect of the plan was to require gas consumers not only to purchase this property (stock) for the employee-stockholders, but also to pay a fair return on this property; that the ownership of the utility must provide the capital funds, but under this plan the gas consumers would provide both the capital funds, in part, and a fair return. United says the stock is purchased on the open market, and the purchase money does not go to the corporation, but to the person who sold the stock on the market. The shares are not treasury stock.

Gordon Meece, testifying for appellant, noted this expense does not in any way provide additional capital; that the company's cost of this stock purchase plan is an essential part of United's operating expenses, as much as payments of salaries and wages to employees. The plan was adopted as a part of the company's over-all employee benefit program, which includes other plans, such as group hospitalization, group life insurance and retirement. The employee pays part of the cost of the stock and the company the remainder. Meece said these additional payments to employees result in improved employee morale, promote employee security, and reduces employee turnover; that it helps United to hire and keep better employees, and is in the best interests of consumers.

In New York Telephone Co., 5 PUR 3d 33, 57 (1954), the New York Public Service Commission stated:

"Here, as in the discussion on pensions, interference with the judgment of management would be injecting the

commission into what amounts to the company's present contract of employment. There can be little doubt that, if these privileges were abolished, the company would be faced with a demand for increased compensation in an equivalent amount and, therefore, no saving to the public would result. That alone would be sufficient reason to refuse to prohibit the practice but this decision is not based on such narrow grounds.

"This commission has repeatedly asserted its position that it will not interfere with the collective bargaining rights which have become inherently part of our American system and that any payment or benefit given labor, in the absence of proof of bad faith, is presumptively a proper expenditure for fixing rates. Any effort on our part to curtail or limit a reduced telephone rate to employees would be as improper as if we were to attempt to fix the number of paid holidays or limit any other right which has been given as a result of an understanding between employer and employee."

In East Ohio Gas Company v. Public Utilities Comm., 133 Ohio St. 212, 12 N. E. 2d 765, 22 PUR (NS) 489, 499-500 (1938), the Supreme Court of Ohio reversed its Commission which had disallowed such an expense. It was there said:

"Certainly, today, there is a general widespread feeling that industry owes to its employees not only the negative duty of refraining from over-working or injuring them, but likewise the affirmative duty of providing them so far as possible with economic security. Expression of such views has found legislative sanction in the adoption of social security laws.

"It would seem that if the plan adopted is a fair one which promotes economic security for the employee and thereby increases his mental and moral efficiency as a worker, such payments made for his benefit should be considered as compensation just the same as his weekly or monthly salary. For this reason, the ruling of the

Commission should be reversed, and the Commission is ordered to make an allowance for the sums actually expended by the company in assisting its employees to purchase stock.''

The Brooklyn Union Gas Company case, 24 PUR 3d 445 (N. Y., PSC, 1958), cited by appellees, involved a plan whereby the company would issue new capital stock only to selected, key employees with a 10-year option within which to speculate. The new stock issue increased the capitalization. The Commission rejected the proposal but stated it had approved general employee plans. The instant program is distinguishable, since it does not affect capital, contains no speculative features, and applies to all employees alike.

■■ In short, we think the Commission erred in disallowing United's expenses incurred in its employee stock purchase plan. Its management no doubt reasoned this was a proper and legitimate operating expense, analogous to the payment of salaries and wages to employees. Certainly we cannot say this program failed to promote employee security and reduce turnover. There is no evidence that this was an abuse of discretion by the management. Somewhat analogous is the holding in Miss. Public Service Comm. v. Home Telephone Co., Inc., 236 Miss. 444, 110 So. 2d 618 (1959), that the Commission erred in disallowing the total amount of salaries of the president and treasurer of a telephone company. There was no evidence that they were excessive or unreasonable. They were related to reasonable needs of the management and the utility.

■■ During 1957, and the six months ended June 30, 1958, United contributed various small sums to charitable organizations aggregating $2,707.00 and $1,136.00, respectively. The Commission disallowed these donations as an operating expense. It thought these were expenses chargeable to the stockholders but not to the rate payers.

Appellant admits there are differences among the courts as to charitable donations being considered a part of operating expenses. However, we conclude the Commission was in error in rejecting these items as operating expenses. A public utility must be a good citizen as well as an efficient servant of its customers. In Application of Diamond State Telephone Co., 51 Del. 525, 149 A. 2d 324 (1959), the Delaware commission disallowed donations of $4,656.00, representing charitable contributions to the Red Cross and the Community Chest. The Superior Court's action in reversing the commission and allowing these items as operating expenses was affirmed by the Supreme Court of Delaware, which said: "Modest contributions to important local charities, made to preserve community good-will, will be allowed as a proper deduction from operating expenses. We agree that the Commission might well disallow them if the contributions were unreasonably large, or if they were not related to the fostering of the good-will of the Company in the locality in which it operates.

"Since the contributions here are clearly within these limits they will be allowed, and the Superior Court's ruling will be affirmed."

We think the rule stated by the Delaware Court and its limitations is sound, and we adopt it. See 65 Public Utilities Fortnightly 289.

In Central Maine Power Co. v. Public Utilities Comm., 153 Me. 228, 136 A. 2d 726, 731 (1957), certain charitable contributions of the utility were disallowed as operating expenses, on the ground that appellant was not required "to give its money to charities, no matter how deserving." However, we do not agree with that restricted interpretation of a utility's function. As was stated in *Diamond State Telephone Company*, the contributions to charity must be made to a proper object and in reasonable amounts, and be related to the fostering of the good-will of the company in the localities in which it op-

erates. However, on remand the commission may consider the effect of resulting savings, if any, on income taxes, and allow only the net cost to appellant of the donations.

 ██ On June 1, 1957, United made a general wage increase of 6 percent. The Commission found that, if this increase had been in effect since January 1, 1957, for the entire test year of 1957, it would have increased the operating expenses of appellant by an estimated amount of $27,019.00 for the entire year. However, it disallowed this item as an operating expense in fixing rates, on the ground the company had offered no evidence to show the net operating results for 1957, if the higher wages had related back for the entire year, as against the greater number of customers for that year. It further stated that the average compensation per employee had increase from $3,040.00 in 1953 to $3,950.00 in 1957, yet in the distribution department the total expense per Mcf of gas sold was no higher in 1957 than in 1953, and there were fewer employees on the payroll. The Commission said it could not isolate wages and make adjustments for that item alone, without considering other factors which tend to reduce the overall cost of service. Hence it declined to normalize for any wage adjustment in 1957 and for the future, and to allow the increased wages as an operating expense. Appellee cites general authorities stating an agency is not bound to accept or reject any specific adjustments, if the overall effect of its action is reasonable.

In the Mississippi Southern Bell case, it was stated: ''In rate making proceedings the practice usually followed is to test rates for the future upon the basis of actual operating experience of a representative period of time and to adjust that experience for changes that appear definite and certain.'' 237 Miss. at 184, 113 So. 2d at 627. Increased wages are definite and certain.

In Central Maine Power Co. v. Public Utilities Commission, 153 Me. 228, 136 A. 2d 726, 731-733 (1957), the Maine commission disallowed additional wage costs as an operating expense, but the court overruled that action and held they were certain and not speculative. The agency contended, as here, that the additional wages were not related by the utility to the overall revenue experience of the company. Moreover, that case involved a wage increase which went into effect after the test year had ended. Here it went into effect in the middle of the test year. Nevertheless, the Court said:

"In the case of wages, we know with the maximum degree of certainty attainable in a forecast that in the period for which rates are to be set there will be an increase in net expense. To ignore this probability is to defeat the very idea of fixing rates for the future upon intelligent and informed estimates. Why should a probability such as this be set aside in favor of the experience of the test year, which we know with certainty will not be repeated in the future? The experience of the test year is at best a 'guess' for the future. If we can make the 'guess' more in line with the probability, in the long run we will have benefitted both public and Company. Much obviously must be left to the sound judgment and experience of the Commission. When, however, the Commission refuses to include in its estimates expenses so plainly observable, we must conclude that it has improperly interpreted the evidence." See also Diamond State Telephone Co., 21 PUR 3d 417, 439 (1958 Del. PSC). In like manner, the Commission erred in disallowing as an operating expense the increased wages appellant began paying on June 1, 1957.

██ ██ By the same token, we think the Commission was in error in disallowing as an operating expense the increase in postage rates which became effective August 1, 1958, and which the company's evidence indicated would aggregate $8,038.00 per year. The postage rate

increase became effective on the same day the proposed rate schedule became effective, August 1, 1958. The amount was figured in accordance with the number of bills mailed out to the customers at the end of the 1957 test year. There is no problem of remoteness or distortion resulting from this precise item of expense. It is unreasonable in fixing rates for the future to disregard the fact that postage for mailing out customers' bills will not again be at the same level as it was during the test year. The expense is definite and ascertainable and should be allowed. Plateau Natural Gas Co., 27 PUR 3d 447, 450 (Kan. SCC, 1959).

■ ■ The company presented pro forma figures for the test year 1957 with adjustments to show expenses by reason of known changes, and revenues were adjusted as if the number of customers in existence on December 31, 1957, had been served for a full year. Such definite and known increased costs must be allowed as an operating expense. We do not think generalizations and estimates that increased efficiency offsets increased costs are adequate to deny the actual increased costs.

### IV. Disallowance as Operating Expense of Supplier's FPC Filed and Bonded Rate Increases

United is a multi-state corporation engaged in distributing and selling at retail natural gas. United has two wholly owned subsidiaries, Union Producing Company (Union) and United Gas Pipe Line Company (Pipe Line).

Union is engaged in natural gas and oil production operations. It is subject to the rate making powers of the Federal Power Commission (FPC) under the Natural Gas Act of 1938. 15 U. S. C. A., Sec. 717-717w; Phillips Petroleum Co. v. Wisconsin, 347 U. S. 672, 74 S. Ct. 794, 98 L. Ed. 1035 (1954). The FPC has the power and duty to fix well-head prices for natural gas. Union sells approximately 85 percent of its natural gas to its affiliate, Pipe Line, and the remainder to non-affiliates.

Union explores for and produces oil and gas. The gas sold to Pipe Line is sold at the same price paid by non-affiliated purchasers in the same field. The FPC has asserted and is continuing to exercise jurisdiction over the price at which Union and any other producer sells to Pipe Line or any other pipe line company.

Pipe Line engages in the purchase, gathering and transportation of natural gas and its sale at wholesale. Its operations are in interstate commerce. It purchases gas from the producing field and transports it to various markets through its pipe lines in Texas, Louisiana, Mississippi, Alabama, and Florida. The 85 percent of the gas found and produced by Union which is purchased by Pipe Line constitutes only 15 percent of the total gas purchased by Pipe Line. The remaining 85 percent is purchased from various producers unaffiliated with United and Union. Pipe Line's operations in Mississippi are in interstate commerce. It sells at wholesale to gas distribution companies such as United and sells industrial gas to large industrial consumers, which latter sales are not regulated by the FPC. However, the price at which gas is sold by Pipe Line in Mississippi to distribution companies, including appellant, is regulated by the FPC.

In short, the price of gas sold by Union to pipe line companies engaged in interstate commerce is regulated by the FPC, and also Pipe Line, which purchases only 15 percent of its total gas acquisitions from Union, charges to distribution companies a price which is regulated and fixed by the FPC. The rate charged by Pipe Line to appellant is the same rate at which gas is sold by Pipe Line to other distributors in Mississippi. Moreover, while Pipe Line sells United all the gas distributed by United in Mississippi, approximately 90 percent of Pipe Line's sales are to other distributing companies and purchasers, in no way connected with appellant. The rates fixed by FPC are the same in each geographi-

cal area. The Mississippi Public Service Commission regulates only the rates of the local distributing corporation, in this instance, those at which United sells to its consumers in Mississippi.

Under Sec. 4 of the Natural Gas Act, every natural gas company, such as Pipe Line, must file with the FPC rate schedules, and no change can be made in any such schedule except after 30 days notice to FPC and the public. 15 U. S. C. A., Sec. 717c(a)-(d). The Commission may suspend for five months a proposed, filed schedule rate increase, but, if the proceeding has not been concluded by that time, "the proposed change of rate, charge, classification, or service shall go into effect." Where increased rates are thus made effective, the Commission may require the natural gas company to furnish a bond to refund any amounts ordered by the Commission at a later date. 15 U. S. C. A., Sec. 717c(e); Natural Gas Act, Sec. 4(e).

As of December 1958, Pipe Line had been collecting from its purchasers three rate increases filed with FPC under bond, since the following dates: April 1, 1956, November 16, 1956, and December 1, 1957. These bonded rate increases became effective pursuant to the Natural Gas Act of 1938. The FPC, at the time of the order of the Mississippi Public Service Commission, had not held a hearing to determine the reasonableness of these rate increases. If it should ultimately disallow any of them, Pipe Line will be required to make appropriate refunds to the affected purchasers of natural gas, including appellant. The FPC has a large back-log of filed and bonded rate increases, concerning which it has been impossible to hold separate hearings. There are several thousand rate increase filings awaiting hearings and decisions. It is estimated that it will take many years for the agency to hear, adjudicate and decide these matters. See Landis, Report on Regulatory Agencies to the Pres-

ident-Elect (Dec. 1960), 86th Cong., 2d Sess., Senate Jud. Comm., pp. 5-7, 54-58, 85.

Appellee found that the aggregate of these bonded rate increases included in the operating expenses of appellant in Mississippi was $409,666.00 in 1957, and $457,-902.00 during the six months ended June 30, 1958. Nevertheless, it refused to allow them as operating expenses. It denied these gas purchase expenses for two reasons:

(1) They were at the time of a conjectural, speculative and contingent character. The FPC has not yet found them to be just and reasonable. Every item of expense included in the cost of utility service must be known and certain.

(2) The Commission is without jurisdiction under the Mississippi act to allow them. Under Sec. 10, Miss. Laws 1956, Ch. 372, it can suspend United's rates only for six months from the date of filing the schedule, which period would expire on December 15, 1958. Thereafter the rates fixed in the order would belong irrevocably to the utility. If at a later date the FPC finds Pipe Line's rate increases are unreasonable, any refund would belong to United. The Commission claimed it could not require United to make refund to its Mississippi gas consumers of amounts received from Pipe Line, because this would require a retroactive, illegal rate order.

The Commission erred in both of the reasons assigned by it.

■ ■ The Mississippi Public Service Commission has no control over the rates of Pipe Line. Under the Natural Gas Act the FPC has exclusive jurisdiction over them. United Gas Pipeline Co. v. Willmut Gas & Oil Co., 231 Miss. 700, 97 So. 2d 530 (1957). The rates which are filed by Pipe Line with FPC are collected under bond, are the filed rates, and remain such unless and until altered by FPC order. Northwestern Public Service Co. v. Montant-Dakota Utilities Co., 181 F. 2d 19 (U. S. C. A. 8th 1950), affirmed in Montana-Dakota Utilities Com-

pany v. Northwestern Public Service Company, 341 U. S. 246, 71 S. Ct. 692, 95 L. Ed. 912 (1951); Citizens Gas Users Association v. Public Utilities Comm. of Ohio, 165 Ohio St. 536, 138 N. E. 2d 383 (1956); City of Chicago v. Illinois Commerce Comm., 13 Ill. 2d 607, 150 N. E. 2d 776 (1958).

During the hearing one of the two principal witnesses for the Commission, Van Scoyoc, stated he would disallow the increases in gas costs, principally on the theory that the decision of the U. S. Court of Appeals in United Gas Pipeline Company v. Memphis Light, Gas and Water Division, 102 App. D. C. 77, 250 F. 2d 402 (C. A. D. C. 1957), precluded recognition of Pipe Line's filed rates. After the hearing but a week before entry of the Mississippi Commission's order on December 15, 1958, the U. S. Supreme Court reversed the Court of Appeals in *Memphis*. 358 U. S. 103, 79 S. Ct. 194, 3 L. Ed. 2d 153 (1958). There were agreements between a pipeline and distributors establishing a price under the seller's rate schedules ''or any effective superseding rate schedules'' on file with the FPC. The pipeline company, proceeding under Sec. 4(d) of the Natural Gas Act, Sec. 717c(d) of 15 U.S.C.A., filed new rate schedules with the FPC. It refused to reject the filings. The Court of Appeals held the FPC lacked jurisdiction to consider the new filed schedules, since Sec. 4(e) applied only to rate changes whose specific amounts had been mutually agreed upon between seller and purchaser. The Supreme Court reversed. It said the procedures provided in Sec. 4(d) were applicable to the filing and review of rate changes, even in the absence of an agreement between seller and buyer, provided the change did not conflict with the rate clauses of a subsisting agreement. *Memphis* clearly recognized the right of a pipeline company to make filings of new rate schedules under Sec. 4. The decision in *Memphis* eliminated the major reason given by Van Scoyoc for disallowing appellant its increased gas costs.

Miss. River Fuel Corp. v. Federal Power Comm., 252 Fed. 2d 619 (U.S.C.A., D.C. 1957) is not in point. There it was held the FPC erred in testing the reasonableness of interaffiliate prices by the use of fair field prices, without more; and the Commission, before approving Pipe Line's increase, should inquire into the justification for the price increase paid by Pipe Line to Union. The prices charged by Pipe Line were not disallowed by the FPC. The court recognized the exclusive jurisdiction over rates of the FPC, which subsequently approved the Union rates. In the instant case appellee has no jurisdiction over the rates of Pipe Line or Union.

Appellee argues the mere fact that Pipe Line and Union are wholly owned subsidiaries of appellant authorized it to disregard the interstate rates filed with the FPC. There is no evidence indicating any abuse of the inter-affiliate prices asserted as costs of the affiliate-purchaser. The Commission made no such finding. The subsidiary-parent company relationship between appellant, Pipe Line and Union warrants regulatory scrutiny of the contracts and dealings between them. However, the jurisdiction to do this and to regulate the price of gas sold by Pipe Line to appellant is clearly defined under the Natural Gas Act. It is vested exclusively in the FPC. Pipe Line must charge and United must pay the filed rates. That price may not be reasonable and is subject to disallowance. There is nothing to suggest that the FPC will not closely scrutinize this relationship, for the statutory purpose of protecting the public and consumers from exploitation. City of Chicago v. Illinois Commerce Comm., supra, 150 N. E. 2d at 780; City of Norfolk v. Virginia Electric & Power Co., 197 Va. 505, 90 S. E. 2d 140 (1955); Citizens Gas Users Assn. v. Public Utilities Comm. of Ohio, supra. Since 90 percent of Pipe Line's sales are to strangers and only 10 percent to appellant, we can assume the other purchasers would protest to the FPC over an unreasonable rate increase.

██ ██ Hence the filed, bonded rate increases in the cost of gas to appellant constitute an operating expense. The Commission's duty was to allow it as such. Such allowance was appellant's statutory and constitutional right.

██ ██ Since the Commission must allow appellant's increased cost of gas from Pipe Line, the remaining question is how it may protect consumers consistent with its statutory powers and duties.

The obvious method of taking care of this problem is to insert in appellant's rate schedule a clause which apparently has been used in other instances in this state, and which is a recognized provision elsewhere. It is called, variously, and automatic adjustment clause in a utility rate schedule, or gas cost adjustment clause, or escalator clause. We hold the Commission has the power to direct use of such a clause. It would provide for an automatic adjustment from time to time of appellant's sale price for gas, to reflect changes in the wholesale cost to appellant of natural gas purchased. It would provide for increases or decreases in the charges for gas sold by United to the extent of increases or decreases in the wholesale price of such gas. City of Chicago v. Illinois Commerce Commission, 13 Ill. 2d 607, 150 N. E. 2d 776 (1958). The escalator clause approved in City of Norfolk v. Virginia Electric & Power Company, 197 Va. 505, 90 S. E. 2d 140 (1955), fell into two parts. The first related to the treatment of changes—up or down— in the cost of purchased gas to the company; the second related to the reduction of rates as a result of refunds received by the company, when certain changes occur in its wholesale cost of gas, by which the company is required to reduce its rates in the amount of refunds received by it from its supplier. *Chicago* and *Norfolk* both affirmed the validity of gas cost adjustment clauses. Numerous other cases have reached the same result as

to electric costs. Foy, Cost Adjustment in Utility Rate Schedules, 13 Vand. L. Rev. 663 (1960).

 ██ The Commission also has the power, as an alternative, to require appellant to make a bond to reimburse the individual consumers for any increased gas costs which may be disallowed to Pipe Line by the FPC. Appellant offered to make appropriate refunds to affected gas consumers, in the event the FPC rejects in whole or in part Pipe Line's charges. Neither procedure would constitute retroactive rate making.

The Public Utilities Act of 1956, Ch. 372, gives the Commission exclusive original jurisdiction over appellant's intrastate operations. Sec. 4. Sec. 9 provides that, "under such reasonable rules and regulations as the Commission may prescribe", every public utility must file its rates and schedules showing all rates and charges. Sec. 13 gives the Commission power to promulgate such rules and regulations which "may be reasonably necessary or appropriate to carry out the provisions of this act." Manifestly the Commission, under its rule-making power, has the right to prescribe conditions and terms in the promulgation of all or parts of a rate schedule.

Sec. 10 provides a specific procedure for changes in any rate, "unless the Commission otherwise orders." The agency may extend the period of suspension for not more than six months, but the utility may put the suspended rates into effect by filing a bond conditioned upon a refund to consumers. Sec. 10 further states that there may be substituted for such bond, "other arrangements satisfactory to the Commission for the protection of the parties interested." The last sentence of Sec. 10 contains a similar clause. See also Secs. 26(d), 27, and 28.

 ██ Rate-making is prospective and not retroactive. Miss. Public Service Commission v. Home Telephone Co., Inc., supra; Laws 1956, Ch. 372, Sec. 11. However, as the Virginia Court held in City of Norfolk v.

Virginia Electric & Power Co., *supra,* 90 S. E. 2d at 148, a gas cost adjustment clause does not fix rates retroactively. It simply authorizes a fixed mathematical formula to be inserted in the schedules of the company for determining future rates. Obviously, since appellant is entitled to assert as an operating expense the increased gas cost, the Commission under these statutes has the power and duty to make arrangements for the protection of the public, and to insert in appellant's rate schedules a gas cost adjustment clause, or the alternative under bond. City of Chicago v. Illinois Commerce Commission, *supra;* City of Norfolk v. Virginia Electric & Power Company, *supra.*

The end result would be an equitable protection of the consumers, and of appellant in its legitimate operating expenses, including wholesale gas costs. Foy, Cost adjustment in Utility Rate Schedules, 13 Vand. L. Rev. 663 (1960). The selection of the details of a method for protecting the consumer in the event of a subsequent disallowance by the FPC of Pipe Line's rate increases is an administrative problem to be decided by the Commission. On remand the Commission will determine the best method. In view of our adjudication that appellant is entitled to be allowed as an operating expense its supplier's FPC filed and bonded rate increases.

Appellant asserts the Commission has used in other recent instances gas cost adjustment clauses. Appellee does not deny this. Parenthetically, United's filed rate schedules, which have been in effect under bond since August 1, 1958 (in the three pertinent parts), contain gas cost adjustment clauses. In the interim since appellee's order under appeal, the FPC may have taken further action on Pipe Line's filed rates. In that event, the Commission on remand can make appropriate adjustments.

## V.

In conclusion, the order of the Commission is affirmed in part, as to its determination of the rate base for the test periods. The order is reversed in part, insofar as the Commission disallowed as operating expenses the cost of an employees' stock purchase plan, contributions to charity, wage and postage increases, and additional gas purchase costs. Since these operating expenses were disallowed by the Commission, and their proper allowance will vitally and substantially affect appellant's rate of return, this cause is remanded to the Commission for further proceedings in accordance with this opinion, and for the determination and fixing of a fair, just and reasonable rate of return. Hence we do not consider or pass on the rate of return fixed by the Commission or the methods used in determining it and its reasonableness. Cf., Southern Bell Tel. and Tel. Co. v. La. Public Service Comm., 239 La. 175, 118 So. 2d 372, 386-387 (1960); Rose, "Cost of Capital" in Public Utility Regulation, 43 Va. L. Rev. 1079 (1957); Nichols, Ruling Principles of Utility Rate Regulation (1955), pp. 191-262, 306-381. The Commission's legislative duty to fix rates, subject to judicial review and consistent with the opinion, must be discharged by it on remand. Miss. Public Service Comm. v. Home Telephone Co., 236 Miss. 444, 110 So. 2d 618 (1959).

The refunding bond, made by appellant in accordance with Secs. 10, 27 and 28, to cover excessiveness, if any, in the rates now in effect, shall continue in effect pending a final determination of rates and their validity. Mississippi Public Service Comm. v. Home Telephone Co., Inc., *supra*.

Affirmed in part, reversed in part, and cause remanded to Public Service Commission.

All Justices concur except Rodgers, J., dissenting in part.